259 N.J. Super. 17 (1992)
611 A.2d 136
FRANK DAFLER AND THERESA DAFLER, HIS WIFE, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
RAYMARK INDUSTRIES, INC., GAF CORPORATION, CELOTEX CORPORATION, H.K. PORTER COMPANY, SOUTHERN TEXTILE CORPORATION, EAGLE-PICHER INDUSTRIES, INC., OWENS-ILLINOIS GLASS COMPANY, GARLOCK, INC., NICOLET, INC., JOHN DOE CORPORATIONS ONE THROUGH TEN, DEFENDANTS, AND KEENE CORPORATION, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 1992.
Decided July 30, 1992.
*19 Before Judges KING, GRUCCIO and BROCHIN.
*20 Jonathan W. Miller argued the cause for appellants (Greitzer & Locks, attorneys; George C. Greatrex, Jr. and James J. Pettit, on the brief).
John C. Garde argued the cause for respondent (McCarter & English, attorneys; Michael A. Tanenbaum, of counsel; John C. Garde and Rosanne C. Kemmet, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.

I
This appeal and cross-appeal are taken from a verdict in plaintiff's favor[1] and a jury's apportionment of responsibility between plaintiff and defendant in an asbestos product liability case. The case presents a question of first impression in this State concerning apportionment of damages for lung cancer between an asbestos producer and a cigarette smoker. The jury found that plaintiff contributed 70% to his lung cancer by cigarette smoking and that defendant Keene Corporation (Keene) contributed 30% to plaintiff's lung cancer by its asbestos products used in shipbuilding. The damage verdict for lung cancer was molded to reflect this apportionment. We conclude that both the apportionment by the jury and the general verdict in plaintiff's favor find reasonable factual support in the record and we affirm.

II
This is the procedural background. On October 10, 1986 plaintiff sued 11 defendants,[2] all manufacturers or distributors *21 of asbestos products. At the jury trial in May 1991 the only remaining defendant was Keene, which had stipulated to successor liability for the asbestos products of its predecessors, Ehret Magnesia Manufacturing Company and Baldwin-Hill Corporation. Plaintiff claimed that he developed asbestosis and lung cancer as a result of occupational exposure to asbestos during his six-year employment at the New York Shipyard in Camden, from 1939 to 1945.
On May 21, 1991 the jury returned liability and damage verdicts in plaintiff's favor. The jury found unanimously that "asbestos exposure was a substantial contributing cause of Mr. Dafler's lung cancer." The jury found Keene, through its predecessors, a substantial contributing cause and 95% responsible. The jury found Garlock, Inc., a defendant who had settled for $2,500 before trial, 5% responsible. The monetary awards were: for asbestosis, $60,000; for lung cancer, $140,000  an aggregate of $200,000. The $60,000 award for asbestosis was apportioned $52,500 to Mr. Dafler for his asbestosis injuries, $7,500 to Mrs. Dafler for her derivative claim. The $140,000 award for lung cancer was broken down as $122,500 to Mr. Dafler for his lung cancer, and $17,500 to Mrs. Dafler for her derivative claim.
As a result of these findings, the overall verdict of $200,000 was reduced by 5% to $190,000 because of the liability attributed to Garlock, Inc. The lung cancer verdicts alone were subjected to the 30/70% apportionment ratio between plaintiff and defendant Keene arrived at by the jury. The residual asbestosis injury award, of course, was not subject to apportionment *22 since it was all attributable to defendant Keene. The net aggregate award to plaintiff, after these adjustments for the settlement with Garlock, Inc. and the plaintiff's own contribution to his lung cancer by smoking, was $96,900.
The judge entered an order on May 31, 1991 in a total amount of $123,108.21, which recognized prejudgment interest in the amount of $26,208.21 and post-judgment interest under R. 4:42-11. A credit of $3,532.98 pursuant to N.J.S.A. 2A:15-9 (credit for collateral sources) was later allowed. All post-trial motions by plaintiff and Keene attacking the verdict were denied.
Both plaintiff and Keene appeal. In this appeal plaintiff raises these claims of error: (1) there was insufficient evidence to allow the jury to apportion damages for plaintiff's lung cancer; (2) the judge improperly influenced the jury's apportionment decision; and (3) there was insufficient evidence to prove Garlock was a substantial contributing factor to plaintiff's injury. Defendant's cross-appeal contends: (1) plaintiff did not establish that Keene's products were a proximate cause of his injuries; (2) the judge improperly charged the jury on product nexus; and (3) the judge improperly refused to allow the jury to consider whether lack of a warning was a proximate cause of plaintiff's injury.

III
These are the facts presented at trial. Plaintiff, Frank Dafler, age 70, worked as a shipfitter at the New York Shipyard in Camden from 1939 to 1945. During the World War II era New York Shipyard was one of the world's busiest ship building facilities, employing 36,000 men. During this period plaintiff worked on 12 to 13 ships. He could not recall the dates, but he remembered the names of the ships. He worked on the battleship, South Dakota; the light cruisers: Alaska, Cleveland, Guam, Hawaii and Montpelier; the carriers: Belleauwood, Cowpens, Cabot, Princeton, Independence, and Monterey; and a tender, Vulcan.
*23 Dafler spent all of his time at the Shipyard working on board these ships. He spent about 70% of his time working in engine rooms and boiler rooms in very close proximity to the pipefitters who used asbestos and asbestos-containing products to cover the numerous pipes housed in those areas. Dafler himself did not work with asbestos, but he said it was all around him. The pipefitters and pipe coverers worked continuously, cutting and cementing pipes. He did not recall the brand names of any of the asbestos products because these products did not relate to his job as a shipfitter, working on the steel plating of the hull and bulkheads. He saw no health warning signs anywhere. No masks were used or provided. He did recall that the pipefitters' use of asbestos made the air very dusty. There was no ventilation in the boiler or engine rooms during construction. He described the asbestos, held in 80 to 100-pound bags, as "very, very dusty" and likened it to pulverized lime. He had no further exposure to asbestos after leaving the Shipyard.
Louis Joyce, also about age 70, testified as a witness on product identification and product nexus. He worked in the Shipyard for about two and one-half years, from 1942 to 1944. He was a helper or handyman to the mechanics in the sheet metal department, putting the permanent ventilation systems in the boiler rooms or engine rooms of the ships. In his job with the fabricating mechanics, he worked right next to the shipfitters. He described the overall work as a continuous "crash-program," around-the-clock; sometimes the men worked double-shifts. He worked on board the ships about 90% of his time at the Shipyard.
Joyce remembered working on nine to ten ships. Of these, he remembered working on the battleship, South Dakota, and the carriers: Princeton, Independence, Langley, Cabot, Cowpens, Monterey, Bataan, Belleauwood, and San Jacinto. He also worked on a number of cruisers but could not give their names. Joyce and plaintiff named seven ships in common, not *24 including cruisers, where they both worked in the boiler and engine rooms.
Joyce and plaintiff did not know each other when they worked at the Shipyard. Up to about 500 people worked on a ship at the same time. Joyce recalled that the pipefitters and pipe coverers, who worked in the boiler and engine rooms, used Ehret asbestos pipe covering, Johns-Manville pipe covering, Baldwin Mono Block asbestos covering, and Ehret and Johns-Manville asbestos-cement bags.[3] He said that he observed these products daily during his employment at the Shipyard. He also recalled seeing Garlock gaskets used.
Joyce saw Ehret asbestos cement in bags "from the first week he worked to the last week." He said that he saw Ehret's asbestos pipe covering 80% of the time. He saw these Ehret cement bags daily, and on each of the nine or ten ships he worked on. He said that he saw more Ehret's pipe covering and cement than Johns-Manville. He saw no health warnings anywhere; there was no ventilation system operating during the time he worked in the ships.
Joyce said that the pipefitters' use of these asbestos products created dust to the extent that "it seemed like a snowstorm." Cleaners would use air hoses and "the stuff would be flying all over the place." When the pipe coverers were dumping the bags of cement and mixing cement, "the air was dusty. It was a loose type of cement like you would pour out and then they would have to get some water to try to mix it." Joyce said their clothes "were very dusty with various dust and fibers all over our clothes and in our hair. It was itchy and some of it you couldn't get off your clothes." He recalled that when Garlock gaskets were used, some were "punched put" on the work site, sending off asbestos dust. On a scale of one to 1,000 (highest) for dustiness, Joyce estimated that Garlock gaskets were one and the pipe covering and cement were 800 or 900.
*25 The plaintiff began experiencing shortness of breath in the 1970s. In 1984 he went to the hospital for breathing problems. The diagnosis in 1984 was asbestosis. He then decreased the time that he worked between 1984 and 1989 because of his breathing problem. In 1984 he began seeing Dr. Agia, a pulmonary specialist, twice a year for x-rays and pulmonary function tests. In 1989 the doctors found a cancerous tumor in plaintiff's lung and surgery ensued. Since his surgery plaintiff has had limited mobility and physical capacity. Plaintiff said that he smoked cigarettes for almost 45 years, since age 18. He had a pack-a-day habit until his diagnosis of asbestosis in 1984 when he quit.
The plaintiff presented two medical experts: Dr. Guidice, a pulmonary specialist, and Dr. Stone, a pathologist. Dr. Guidice explained that the cause of plaintiff's asbestosis and later bronchogenic carcinoma, or lung cancer, was his occupational exposure to asbestos at the Shipyard. His opinion, and Dr. Stone's, on causation amply created a jury question on the claimed work-connected genesis of the lung cancer, a causation which defendant's expert, Dr. DeMopolous, a pathologist, denied completely. He thought that cigarettes alone caused the plaintiff's lung cancer.
The experts also testified on the epidemiological aspects of asbestosis and cigarette smoking. Dr. Guidice explained that there is a "base line" relative risk of 11 cases of lung cancer per 100,000 persons in the general population per year. This "base line" is for people in the general population who do not smoke and are not exposed to asbestos. The relative risk of lung cancer with industrial exposure to asbestos, like plaintiff's occupational exposure, increases five-fold (5:1), or to 55 cases per 100,000 of population per year. The relative risk with cigarette smoking increases ten-fold (10:1), or to 110 cases per 100,000 of population per year. The relative risk of exposure to asbestos plus cigarette smoking is not additive, i.e., 10 + 5 or 15-fold, but becomes what Dr. Guidice described as "multiplicative *26 or synergistic," or 50 times (50:1) the "base line," i.e., 550 cases per 100,000 of population per year.
Dr. Guidice could not apportion the causation of plaintiff's lung cancer between his asbestosis and his long-term cigarette smoking. He said when asked about apportionment: "No, and I don't know anybody that's able to do that. That's not possible. This relationship is synergistic and multiplicative between those two cancer causing agents. It's not possible to distinguish which contribution is caused by asbestos and which is caused by cigarette smoking." He conceded that the major cause of lung cancer in the United States is cigarette smoking.
Dr. Stone essentially agreed with Dr. Guidice on the epidemiological data. He thought the relative risk for cigarette smoking alone was about 10 to 12:1 above the "base line," the relative risk for asbestosis alone was about 6 to 7:1 above the "base line." He said that "the lung cancer was caused by the synergistic interaction of his cigarette smoking and asbestos exposure." He also agreed that cigarette smoking was by far the greatest cause of all lung cancers in the United States. He did not attempt to apportion responsibility, saying that "both were significant contributory causes." Both doctors agreed that the relative risk of smoking was twice as great as the relative risk for asbestos with respect to cancer.
As noted, the defendant's expert, Dr. DeMopolous, completely discounted any role for asbestos in causing the plaintiff's lung cancer. He emphasized the role of cigarette smoking as solely causative in this case and in lung cancer in general. He appeared to think that the relative risk for cigarette smoking was somewhat higher than the estimates of plaintiff's experts, but he basically did not disagree with their epidemiological data. He recognized the theoretical synergistic effect of two causative factors but denied any role for asbestos in plaintiff's lung cancer. Dr. DeMopolous did not speak to apportionment.
The jury seemed to have apportioned the damages for plaintiff's lung cancer according to the relative risk factors for *27 asbestos (5:1 or 30%) and cigarette smoking (10:1 or 70%), roughly one-third to two-thirds. The judge molded the jury's monetary verdict on the lung cancer aspect, $140,000, accordingly.

IV
Plaintiff's principal claim on this appeal is that the judge erred in submitting the issue of apportionment to the jury in the first place. Plaintiff contends that there was insufficient evidence in the record to provide any basis for apportionment. Judge Weinberg thought this case presented enough evidence to justify allowing the issue to go to the jury. He said:
The case before us involves an exposure to asbestos of approximately five years. It involves cigarette smoking for almost half a century. I have never  or I have not in the past apportioned this. I did not have a case before me in the past that I felt there was sufficient facts and sufficient expert testimony that would permit the jury to do anything other that [sic] utter speculation.
I think this is a case that permits the jury to consider the facts regarding exposure to asbestos and the extent and the amount and the time of cigarette smoking in conjunction with the expert evidence, if the jury accepts the same, and the jury can make a determination regarding a percentage of causation as to the lung cancer.
I am not suggesting that every case where cigarette smoking happens to be involved is an appropriate case for the apportionment being made. I am making a determination that in this particular case with the facts in this case and the testimony in this case, that I believe that it is a proper item for jury consideration and I intend to submit it to them for that purpose. They will provide us a verdict as to the apportionment.
Although the issue is novel in this jurisdiction, we agree with the trial judge and affirm on this point.
Plaintiff asserts that the lung cancer was an indivisible harm with indivisible damages, that the defendant failed to meet its burden of showing that there was a reasonable basis for apportionment, and that the percentages found by the jury, 30%-70%, were against the weight of the evidence. Defendant Keene contends that the use of apportionment in this case was consistent with the evidence and the development of the law in this State.
*28 Apportionment of damages among multiple causes is a well-recognized tort principle. The Restatement (Second) of Torts § 433A, at 434 (1965), regarding apportionment of harm to causes, states:
(1) Damages for harm are to be apportioned among two or more causes where
(a) there are distinct harms, or
(b) there is a reasonable basis for determining the contribution of each cause to a single harm.
(2) Damages for any other harm cannot be apportioned among two or more causes.
Comment (a) to the Restatement indicates that "[t]he rules stated apply also where one of the causes in question is the conduct of the plaintiff himself, whether it be negligent or innocent." Restatement (Second) of Torts § 433A, Comment (a), at 435. Prosser and Keeton, Law of Torts § 52, at 345 (5th ed. 1984), states the problem this way:
Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm of which that defendant's conduct has been a cause in fact, it is likely that the apportionment will be made. Where no such basis can be found, the courts generally hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it.
The Restatement and Prosser both recognize that the concern in apportioning responsibility is more practical than theoretical: is there "a reasonable basis for determining the contribution of each cause to a single harm?" Restatement, supra, § 433A(1)(b) at 434. Here the single harm to the plaintiff was his lung cancer. The two causes were his six-year occupational exposure to asbestos and his 45-year cigarette smoking habit. The trial judge had to determine, as a matter of law in the first instance, whether the harm was capable of apportionment. See Martin v. Owens-Corning Fiberglas Corp., 515 Pa. 377, 528 A.2d 947, 949 (1987). The burden of proving that the harm is *29 capable of apportionment is on the party seeking it, here defendant Keene. Restatement, supra, § 433B(2), at 441.
Several state and federal courts have considered the apportionment issue in similar occupational asbestos-smoking cases. The Pennsylvania Supreme Court addressed the apportionment issue in Martin v. Owens-Corning Fiberglas Corp., supra. The plaintiff, a former insulation worker, brought suit against various asbestos manufacturers seeking damages for asbestosis and lung impairment. Plaintiff worked with asbestos for about 39 years, and smoked for about 37 years. At trial, plaintiff's experts testified that his lung impairment was due to the combined effect of emphysema, caused by cigarette smoking, and asbestosis, from occupational asbestos exposure. They said that it was impossible to apportion the lung impairment between the two causes. 515 Pa. at 383, 528 A.2d at 950. Defendant's expert testified that the lung impairment was caused solely by plaintiff's cigarette smoking. The question presented on appeal was whether the trial judge erred in instructing the jury that it could apportion damages between the asbestos exposure and smoking. Id. at 379, 528 A.2d at 948. There were no epidemiological data or relative risk factors before the jury in Martin.
A plurality of the Pennsylvania Supreme Court applied § 433A of the Restatement and held that it was error for the trial judge to instruct the jury on apportionment since the evidence failed to establish a reasonable basis on which to apportion. Id. at 383-387, 528 A.2d at 950-951. The court commented:
The jury, although presented with a great deal of testimony concerning appellant's history and physical condition, was provided no guidance in determining the relative contributions of asbestos exposure and cigarette smoking to appellant's disability. In fact, two experts testified that such a determination was not possible.
* * * * * * * *
Here, as in Offensend [v. Atlantic Refining Co., 322 Pa. 399, 185 A. 745 (1936)], the jury cannot be expected to draw conclusions which medical experts, relying on the same evidence, could not draw. The causes of disability in this *30 case do not lend themselves to separation by lay-persons on any reasonable basis. Thus, common sense and common experience possessed by a jury do not serve as substitutes for expert guidance, and it follows that any apportionment by the jury in this case was a result of speculation and conjecture and hence, improper. "Rough approximation" is no substitute for justice. [Id. at 384, 528 A.2d at 950, footnotes omitted].
In his concurring opinion, Justice McDermott said that he would limit the holding of the three-judge plurality to a single proposition, that "under the facts and circumstances of this case there was not enough evidence to submit the issue of apportionment to the jury." Id. at 386, 528 A.2d at 951. Thus, the Pennsylvania Supreme Court did not rule out apportionment in cases where the evidence in fact supports a reasonable basis upon which to divide the harm.
In strong, separate dissents, both Chief Justice Nix, joined by Justice Zappala, and Justice Hutchinson criticized the plurality for overstepping its bounds and usurping the jury's fact-finding function. Id. at 385-389, 528 A.2d at 951-952. They emphasized that a jury should be allowed to make "rough approximations" where there is a reasonable basis to apportion, especially where the plaintiff's own conduct is a substantial factor in bringing about the harm. Id. at 385-392, 528 A.2d at 951-954. Justice Hutchinson, in his dissent, made these thoughtful comments in expressing his view that the jury should enjoy considerable latitude and employ common sense in its apportionment task:
I am at a loss to imagine what additional testimony would satisfy the majority. Requiring the experts to speak in terms of numerical percentages introduces a false precision into the evidence. Mathematical exactitude is not found in the real world of medicine. We should not mislead lay jurors by requiring experts to falsely imply its existence. Honest, but more flexible, words such as "substantial factor," "major contribution" or "significant cause" are more suitable to the proper jury function of justly and fairly resolving uncertainties. It is unfair and unjust to place on appellee the whole burden of supporting appellant for a disability his own experts admit he himself substantially caused. [Id. 528 A.2d at 954; footnote omitted].
In Borman v. Raymark Indus., Inc., 960 F.2d 327 (3d Cir.1992), the Third Circuit, applying Pennsylvania law, recently declined to hold that the record was adequate to support a jury *31 instruction on apportionment between smoking and asbestos exposure. The record contained epidemiological data on relative risks quite similar to the record before us. Id. at 329-331. The Circuit Court observed that appellant "Celotex argues with considerable plausibility that despite the inability of the experts to assign a percentage of contribution to each cause, the evidence provided the jury with a reasonable basis for apportioning damages between the two causes in this case." Id. at 334. The dissent of Justice Hutchinson in Martin, supra, 515 Pa. at 3, 528 A.2d at 954, to which we have alluded supra at 30, 611 A.2d at 143, was favorably referred to and quoted by the Circuit Court, 960 F.2d at 334, n. 12. The Circuit Court, however, noted that "we are not free to treat this issue as if it were a matter of first impression in our court." Ibid. Due to the holding of Martin, the Circuit Court felt constrained to deny an apportionment ruling favorable to the appellant. The Circuit Court, interpreting state law, said: "We predict that the Pennsylvania Supreme Court would hold this evidence insufficient to support a charge on apportionment of damages." Ibid.
Quite obviously, the Third Circuit thought the evidence sufficient for apportionment but was constrained under its diversity jurisdiction by applicable state law. Of course, we are not controlled by Pennsylvania law as was the Circuit Court. We are free to conclude, as the Circuit was not, "that where a factual basis exists, it is preferable in the interest of fairness to permit some rough apportionment of damages, rather than to hold the defendant entirely liable for a harm that was inflicted by separate causes. See Prosser and Keeton, supra, at 345." Ibid.
Pennsylvania's intermediate appellate court followed Martin in affirming a trial judge's decision not to allow the issue of apportionment to go to the jury absent some epidemiological data on relative risks of causative factors. Taylor v. Celotex Corp., 393 Pa.Super. 566, 574 A.2d 1084, 1095-1098 (1990); see also Guidry v. Johns-Manville Corp., 377 Pa.Super. 308, 547 A.2d 382, 386 (1988). We conclude that while Pennsylvania *32 generally recognizes that apportionment is theoretically available where each of several causes' relative contribution can be reasonably estimated, we have no inkling yet of the threshold quantum of proof required in that jurisdiction.
Some other jurisdictions have permitted apportionment in these cases. In Brisboy v. Fibreboard Corp., 429 Mich. 540, 418 N.W.2d 650 (1988), the Supreme Court of Michigan upheld a jury finding that plaintiff's smoking contributed 55% to his lung cancer while 45% was attributable to his asbestos exposure, apparently without the benefit of epidemiological testimony. See Jenkins v. Halstead Indus., 17 Ark. App. 197, 706 S.W.2d 191 (1986) (92% of worker's chronic obstructive pulmonary disease apportioned to life-long cigarette smoking in workers' compensation case). See also Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1138-1140 (5th Cir.1985) (under Texas law, determination is for the jury); Fulgium v. Armstrong World Indus., Inc., 645 F. Supp. 761, 763 (W.D.La. 1986) (apportionment allowed under Louisiana law); Champagne v. Raybestos-Manhattan, Inc., 212 Conn. 509, 562 A.2d 1100, 1118 (1989) (plaintiff's smoking found 75% contributory to his lung cancer, citing Michigan's Brisboy v. Fibreboard Corp., supra); Hao v. Owens-Illinois, Inc., 69 Haw. 231, 738 P.2d 416 (1987) (51% smoking; 49% asbestos exposure ratio of apportionment affirmed).
No New Jersey cases have specifically addressed the issue of apportionment of civil law damages in an asbestos-exposure cigarette smoking context. We did approve such an apportionment in a workers' compensation setting. See Field v. Johns-Manville Sales Corp., 209 N.J. Super. 528, 531, 507 A.2d 1209 (App.Div.), certif. denied, 105 N.J. 531, 523 A.2d 172 (1986); N.J.S.A. 34:15-12(d) (credit to employer for loss of function from other cause). However, the concept of apportionment of damages is not alien to this jurisdiction. The theory of § 433A of the Restatement (Second) of Torts has been applied in varied circumstances. See Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990) ("increased risk" and "lost chance" concepts in *33 medical malpractice); Waterson v. General Motors Corp., 111 N.J. 238, 270, 544 A.2d 357 (1988) (automobile "crashworthiness" case); Fosgate v. Corona, 66 N.J. 268, 330 A.2d 355 (1974) (medical malpractice aggravating tuberculosis); Bendar v. Rosen, 247 N.J. Super. 219, 588 A.2d 1264 (App.Div. 1991) (medical malpractice superimposed on auto accident injury). These cases involve pre-existing or concurrent injuries; apportionment was limited to instances of distinct injuries or to circumstances when a reasonable basis existed to determine the contribution of each cause. The burden with respect to proof of apportionment rested, of course, with the party seeking it. Restatement (Second) of Torts § 433B(2); Scafidi, supra, 119 N.J. at 113-114, 574 A.2d 398; Waterson, supra, 111 N.J. at 269, 544 A.2d 357.
In Scafidi v. Seiler, supra, our Supreme Court reaffirmed the principle that damages may be apportioned where causation can be attributed to more than one causative factor. In that medical malpractice action, plaintiff alleged that the defendant doctor failed to provide proper treatment for her medical condition, resulting in the premature birth and death of her infant. The court reexamined the principle set forth in Fosgate v. Corona, 66 N.J. 268, 330 A.2d 355 (1974), that when a preexisting injury is aggravated, the culpable defendant "should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are." Id. 119 N.J. at 110, 574 A.2d 398, quoting Fosgate, 66 N.J. at 272-273, 330 A.2d 355. The Court instructed that to the extent that the defendant seeks to apportion damages, he must demonstrate evidence tending to show that the premature birth and death could have been attributable solely to the preexisting condition, irrespective of the defendant's own negligence. Id. 119 N.J. at 113-114, 574 A.2d 398. "Based on the evidence adduced, the jury will be instructed to determine the likelihood, on a percentage basis, that the infant's birth and death would have occurred even if defendant's treatment were faultless." *34 Id. at 114, 574 A.2d 398. The judge could then "mold the verdict to limit defendant's liability to the value of the lost chance for recovery attributable to defendant's negligence." Ibid.
The most recent pronouncement on apportionment is found in Judge Dreier's opinion in Bendar v. Rosen, 247 N.J. Super. 219, 588 A.2d 1264 (App.Div. 1991). There plaintiff suffered injuries as a result of a car accident and was taken to a hospital where x-rays were performed. Unbeknownst to plaintiff or her doctors, she was pregnant at the time the x-rays were taken. Plaintiff, who three years earlier had undergone a sterilization procedure, elected to abort her pregnancy after her doctors determined that the x-ray may have injured the unborn child. She suffered consequent emotional distress and sued the drivers involved in the accident, the doctor who performed the prior ineffective tubal ligation, and the treating physician for the accident-related injuries, alleging that all defendants were the proximate cause of the termination of her pregnancy and her emotional distress. After a liability trial, the jury determined that both the drivers and the physician who performed the tubal ligation were proximate causes of plaintiff's abortion and awarded damages. Id. at 229, 588 A.2d 1264. The trial judge refused to allow the jury to apportion responsibility for damages related to the abortion, ruling that the termination of the pregnancy was a "single event" that was incapable of apportionment, and there was no testimony from which the jury could rationally apportion liability between the physician and the drivers. Id. at 231-232, 588 A.2d 1264.
We disagreed with both of the trial judge's conclusions and remanded for a new trial concerning the apportionment of the abortion-related damages. Id. at 235, 588 A.2d 1264. Regarding the "single event" analysis, Judge Dreier noted that there is usually one injury with several causes in tort actions and it is the function of a jury, pursuant to N.J.S.A. 2A:15-5.2b, the comparative negligence statute, to determine the percentages *35 of fault attributable to each party. Id. at 232, 588 A.2d 1264. Under the rationale of Restatement § 433A, a single injury with multiple causes is "presumed to be joint and several unless there are either distinct harms or a reasonable basis upon which to determine the contribution of each cause of a single harm." Ibid. Noting that the principles applied in preexisting injury cases should also be applicable in this context, we held that there was a reasonable basis for apportionment and it should be permitted. Id. at 232-233, 588 A.2d 1264. In conclusion we stated:
In short, although the injury cannot be divided, the jury heard substantial testimony concerning plaintiff's motivations for the abortion, and the effect of each occurrence upon her decision. The judge should have permitted the jury to quantify the percentage of proximate cause arising from each event, if it could do so. A basic unfairness may have been visited upon one of the parties if the jury might have determined that one event was primarily responsible for plaintiff's decision, and the other event only slightly responsible. We therefore must remand for a new trial concerning the apportionment of the sizeable abortion-related damages [$250,000] determined by the jury. [Id. at 234-235].
As we well know, apportionment is also consistent with the principles of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.3, and the Contribution Among Tortfeasors Act, N.J.S.A. 2A:53A-1 to -5. See also Feldman v. Lederle Lab., 257 N.J. Super. 163, 608 A.2d 356 (App.Div. 1992) (apportionment of damages for incremental injury approved).
We conclude that there was ample basis in the record of this trial to submit the issue of apportionment to the jury. The extant legal precedent supports rational efforts to apportion responsibility in such circumstances rather than require one party to absorb the entire burden. The jury obviously accepted the epidemiological testimony based on relative risk factors, the smoking history over 45 years, and the substantial occupational exposure over six years. The synergistically resultant disease, lung cancer, was produced by a relative risk factor of 10:1 contributed by plaintiff and 5:1 contributed by defendant. The jury probably shaded the apportionment slightly in defendant's favor, 70% instead of two-thirds, because of the strong emphasis *36 on cigarette smoking as the greatly predominant overall cause of lung cancer in this country.
The result was rational and fair. We can ask no more. This is fairer than requiring defendant to shoulder the entire causative burden where its contribution in fact was not likely even close to 100%. Or fairer, for certain, than no recovery at all for plaintiff who, while a victim of the disease of asbestosis which probably led in part to the lung cancer, confronts a reluctant jury which might not want to saddle a defendant with a 100% verdict in the circumstances of a particular case.
We conclude that our Supreme Court's recent decision in Landrigan v. Celotex Corp., 127 N.J. 404, 415-416, 605 A.2d 1079 (1992), a colon cancer asbestos claim, supports the result we reach in relying on the epidemiological data for apportionment. This discipline of epidemiology "studies the relationship between a disease and a factor suspected of causing the disease, using statistical methods...." Id. at 415, 608 A.2d 356. The Supreme Court recognized that "proof of causation in toxic-tort cases depends largely on inferences derived from statistics about groups," id. at 422, 608 A.2d 356; and conceded that plaintiffs in toxic-tort cases "may be compelled to resort to more general evidence, such as that provided by epidemiological studies." Id. at 415, 608 A.2d 356. See also Caterinicchio v. Pittsburgh Corning Corp., 127 N.J. 428, 436, 605 A.2d 1092 (1992), a companion case to Landrigan.

V
We turn to the remaining points raised by plaintiff-appellant. Plaintiff alleges that the judge improperly influenced the jury on the issue of apportionment during his charge. Plaintiff alleges error because the judge made these comments regarding apportionment:
Should you decide that both, that is plaintiff's exposure to asbestos as well as his cigarette smoking were both substantial contributing factors to his lung cancer, then you will consider and attempt to determine what percentage that each substantially contributed to Mr. Dafler's lung cancer condition. *37 Now if this Court believed that there was insufficient evidence and it would give you an impossible task in trying to apportion the two, if you come to the conclusion that both were responsible, then of course, I would have  I would not request you to proceed to an impossible task. I do believe that there's evidence in this case upon which you can consider and come to a conclusion respecting the apportionment between the two if you find that both were responsible. [Emphasis added].
A trial judge may comment on the evidence to assist the jury in understanding the law and in performing their fact-finding function. Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 176, 406 A.2d 140 (1979); Village of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 128, 145 A.2d 306 (1958). The comments must be made to assist the jury, not to control their findings. Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 570-571, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986). Care must be taken that any expression of opinion does not mislead the jury, is warranted from the proof, and does not serve to usurp or control the jury's finding. Vassallo v. Bell, 221 N.J. Super. 347, 380, 534 A.2d 724 (App.Div. 1987). We must evaluate the instructions to the jury as a whole to determine whether the trial judge's comments confused or misled the jury. Latta v. Caulfield, 79 N.J. 128, 135, 398 A.2d 91 (1979); Navarro, supra, 211 N.J. Super. at 570, 512 A.2d 507.
Plaintiff's counsel did not object at all to the judge's comments at the time they were made. R. 1:7-2. He first voiced an objection at the time of oral argument on the motion for a new trial. The judge stated on the record at the time of the motion for a new trial:
I did add to my charge as  as a result of the argument that you made, that the Court would not have requested them to consider doing it unless the Court felt that they could do it, not that they should do it or that they must do it, but that there was the possibility that they could do it.
Absent any timely objection to the jury instruction, we consider the matter under the "plain error" standard. R. 1:7-5; R. 2:10-2. If a timely objection had been made a strong curative instruction or corrected charge could have been given on the spot.
*38 Considering the instructions as a whole, we do not find that the judge's comments very likely misled or influenced the jury's apportionment decision. The judge fully informed the jury that they were the final arbiters of fact, and that their recollection alone would control their decision. The judge removed several issues from the jury's consideration  namely, successor liability, absence of any warning, and that plaintiff had proven defendant's liability for his asbestosis and had proven the presence of a defect in defendant's asbestos-containing products  and he told them so very specifically. The jury was carefully instructed, however, that the plaintiff's lung cancer claim and any apportionment of it remained open for their consideration.
Regarding the issue of apportionment, the judge correctly instructed the jury on Keene's burden to prove that cigarette smoking was a substantial contributing factor to plaintiff's condition, as well as on its burden to prove that responsibility should and could be apportioned. He said:
Now it is solely the burden of Keene Corporation, not the plaintiff's burden, to prove (a) that the plaintiff's injury can be divided between the two potential causes and also what the apportionment is. If you find that Keene has not met its burden, then of course you do not apportion between the two.
The judge's explanation of the special interrogatories to the jury also reinforced the jury's role as sole fact-finder and gave no emphasis to any need for the jury to apportion:
Number six: If you have determined that both plaintiff's exposure to asbestos and cigarette smoking were substantial contributing factors to the development of his lung cancer, then you must answer this question: "Taking the combined effect of both asbestos exposure and cigarette smoking regarding plaintiff's lung cancer as equalling or as being 100 percent, what percentage of said lung cancer is attributable to (A) asbestos exposure, (B) cigarette smoking."

Therefore, again, you will attempt to provide us with a percentage regarding the two elements, if you determine that both bear responsibility. Now if you are unable to assess that percentage, then you will indicate that to me and at the bottom of the last paragraph on number six question. [Emphasis added].
Viewed as a whole and in conjunction with the interrogatory explanations, we find no prejudicial reversible error in the judge's comments. We suspect that if his comments sounded *39 prejudicial at the time they were given, counsel would have promptly objected.
We also conclude that there was enough evidence to support the jury finding of 5% contribution from the Garlock gaskets. Recall that plaintiff had settled before trial with Garlock for $2,500, which entitled Keene to a finding of Garlock's percentage contribution, if any, to the liability picture. See Young v. Latta, 123 N.J. 584, 588-589, 589 A.2d 1020 (1991); N.J.S.A. 2A:15-5.1 to 5.3. There was proof that the gaskets, when cut, produced and added to the asbestos dust from the cement and pipe covering products. We will not interfere with the jury's conclusion on this point.

VI
On the cross-appeal, we conclude that there was sufficient evidence to create a jury question on Keene's liability. There was also sufficient proof before the jury to allow the inferences of "frequency, regularity and proximity" of exposure expressed in Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 568 A.2d 1196 (App.Div. 1989). See Rotondo v. Keene Corp., 956 F.2d 436, 441 (3d Cir.1992), where the Circuit Court, under similar circumstances, affirmed a verdict for the plaintiff who worked on the Monticello at the Philadelphia Naval Shipyard for several months when pipecoverers, in close quarters, used Ehret products about "50% of the time."
Nor do we see any error in the charge on "product nexus." The charge as a whole on the point was adequate and accurate. We find nothing misleading or incorrect about the charge when read in its entirety. Latta v. Caulfield, 79 N.J. 128, 135, 398 A.2d 91 (1979). Finally, defendant's point on lack of warning is clearly without merit. R. 2:11-3(e)(1)(D); see Coffman v. Keene Corp., supra, 257 N.J. Super. 279, 608 A.2d 416 (App.Div. 1992).
Affirmed.
NOTES
[1] Reference to "plaintiff" is to Frank Dafler who sued for his asbestos injury and consequent lung cancer; his wife, Theresa Dafler, sued for her derivative damages.
[2] The eleven initially-named defendants were: Raymark Industries, Inc.; GAF Corporation; Celotex Corporation; H.K. Porter Company; Southern Textile Corporation; Eagle-Picher Industries, Inc.; Keene Corporation; Owens-Illinois Glass Company; Garlock, Inc.; Nicolet, Inc.; and John Doe Corporations One-Ten. According to plaintiff's brief, prior to trial, plaintiff settled with defendant Garlock, Inc. and the other defendants are in Chapter 11 proceedings in federal bankruptcy court, except GAF Corporation which obtained a dismissal and Owens-Illinois, Inc. which was never served. From the limited record before us it appears that the Manville Trust was joined and then severed prior to trial.
[3] Recall that Ehret and Baldwin were Keene's predecessor corporations.