279 N.J. Super. 517 (1995)
653 A.2d 603
SANFORD WEED AND NANCY WEED, INDIVIDUALLY AND T/A WEED'S TEXACO, PLAINTIFFS-APPELLANTS,
v.
CASIE ENTERPRISE, A DIVISION OF REZULTZ, INC., A CORPORATION OF THE STATE OF NEW JERSEY, OR LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY, T/A PROTANK,[1] DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1995.
Decided February 22, 1995.
*520 Before Judges VILLANUEVA, WEFING and BRAITHWAITE.
Lewis J. Schweller argued the cause for appellant (Mr. Schweller and H. Robert Boney, Jr., attorneys; Mr. Schweller, of counsel and on the brief).
Mitchell H. Kizner argued the cause for respondent (Riesenburger & Kizner, attorneys; Mr. Kizner and Sharon Oras Morgan, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Plaintiffs, Sanford Weed and Nancy Weed, appeal from a jury verdict of no cause of action in favor of defendant, and plaintiff Sanford Weed appeals from an award of $92,514.24 under N.J.S.A. 2A:15-59.1, the so-called frivolous litigation statute (Act), to defendant. In the latter appeal, the issue is whether a plaintiff who in bad faith fabricates a lawsuit can be assessed under the Act for attorney and expert fees incurred by the defendant successfully defending the lawsuit. We hold that he can so be assessed and affirm both judgments.
Plaintiffs, Sanford Weed and Nancy Weed, individually and t/a Weed's Texaco, sued defendant Casie Ecology Oil Salvage, Inc. (Casie or defendant) to recover damages for an environmental cleanup resulting from a spill of gasoline allegedly caused by defendant's negligent removal of a gasoline storage tank from plaintiffs' property. Plaintiffs sought recovery upon theories of breach of contract and negligence.
Sanford Weed (Weed or plaintiff) operated a gasoline business there from 1977 to 1987. The site in question had been used as a *521 gasoline filling station since 1954. The original fuel storage tanks and underground pipes were used until 1987.
Sanford Weed testified that while one of Casie's workmen was in the excavation hole striking the pipe leading from the tank to the pump island with a sledgehammer in order to disconnect it, a spill occurred which lasted approximately two to three minutes and caused an estimated 50 gallons of fuel to be released. He stated that, although he knew of the spill, neither he nor Casie did anything to try to stop the spill or contain the product. Indeed, he claimed that he did not even watch the spill while it was happening and was busy attending to various matters. He also testified that he never contacted the Department of Environmental Protection (DEP)[2] to report the spill and did not tell anyone about it until the DEP contacted him, which is when he claims to have first learned that there was a problem. He further confirmed that he did not complain to Casie about the alleged spill and paid Casie in full on four separate occasions for its work. He conceded that the first time that Casie was informed that Weed believed Casie was responsible for the cleanup of his premises was a few months before he filed the complaint in September 1991 when his lawyer contacted Casie.
The main issue at the trial was whether an event that caused a spill had occurred prior to Casie's arrival on the premises on May 16, 1987. Indeed, a DEP document showed that on May 15, 1987, Patrolman Reindwalds of the Egg Harbor Township Police Department reported that on May 14, two days before Casie did its work, a spill of gasoline was noted during underground tank removal at the Weeds' premises. At trial, Weed testified that the day before Casie arrived, an excavator hired by Weed used a backhoe to expose the tank and later two of Weeds' employees then dug out soil around the tank. Weed insisted that neither his *522 men nor the excavator touched the tank or the pipes connected to the tank, and gave contradictory accounts as to whether the excavator was Michael Zyndorf or Brian Osborne.
An important issue at the trial was whether the gasoline that had been stored in the tank removed by Casie was leaded or unleaded. In a deposition taken in June 1992, Weed stated that the tank held unleaded fuel before he had stopped using it. However, after Casie's expert determined that most of the contamination on the site, including that in the area where the 3,000-gallon tank had been removed by Casie, was from leaded gasoline, Weed submitted an affidavit to the court signed June 14, 1993 which stated that he distinctly remembered testifying to the storage of leaded gasoline in the particular tank and the "Court Reporter apparently typed up my testimony as indicating unleaded gasoline in that tank. That is not correct.... [M]y specific recollection [is] that there was leaded and only leaded gasoline in the tank which was the subject of the excavation and which is the subject of this litigation."
Following the submission of Weed's affidavit, the defendant obtained a document that Weed had signed and submitted to the DEP in May 1986 in which he stated that the tank in question contained unleaded gasoline. The DEP document was an "underground storage tank registration questionnaire" which stated that Weed's Texaco had five tanks  two 3,000-gallon tanks, one 4,000-gallon tank, one 2,000-gallon tank, and one 1,000-gallon tank with diesel fuel. The questionnaire indicated that both 3,000-gallon tanks contained unleaded gasoline. Casie removed one of these 3,000-gallon tanks. At trial, Weed ultimately conceded that the tank had in fact contained unleaded gasoline before he stopped using it.
Weed also conceded that he observed a hole on the top of the tank after it was removed from the excavation, but insisted that the hole was only pinpoint in size. However, he admitted that the tank was rusty and that he did not look for any other holes in the tank. In a pretrial deposition Weed had testified that his decision *523 to have the storage tank removed by Casie was not prompted by a belief that the tank was leaking, rather he was preparing the property for sale. At trial, however, he testified that Casie's services were requested because of "the possibility" the tank was leaking. Weed's admission that inventory records had shown a loss of product from the tank and that he had it removed because of a belief that it might be leaking occurred after the defense took a deposition of Weed's former gas station manager, Charles "Butch" Giovinazzi. Contrary to Weed's deposition testimony, Mr. Giovinazzi testified that Weed knew prior to the removal of the tank that it was leaking. Likewise, Weed's inventory records for his other tanks revealed fuel shortages, but he nevertheless continued to use them.
Although Weed testified at trial that only he and Casie's employees witnessed the spill, the next day he produced a witness, Draper Ellis, a former employee and tenant, who claimed he witnessed the spill. Ellis testified that he observed the initial digging with the backhoe and the digging with the shovels. The men doing the digging, Ellis alleged, were Casie's employees who attempted to disconnect a pipe from the bottom of the tank with "enormously large pipe wrenches." The men then reportedly beat on the pipe with sledgehammers for about an hour. Next, Ellis testified that he saw the bottom of the pipe split, and gasoline "come pouring out all over the place." According to Ellis, the workers scrambled about to stop the spill, but the gasoline spilled into the earth for 20 to 30 minutes unabated because Casie did not have a receptacle to catch it.
On cross-examination, Ellis insisted that Casie's men operated the backhoe to break the concrete, exposed the tank, banged on a pipe and caused the spill. However, he also confirmed making a certification to an investigator, Robert Browne, on November 6, 1992, which stated that he was on the premises when they were taking the gas tank out, but he "wasn't where they were working." The certification further stated that he did not remember if there was any spillage when they took the tank out and did not know *524 who took the tank out. Ellis attributed the discrepancy in his testimony and statement to "a major heart attack" he suffered just prior to giving the statement.
Prior to November 6, 1992, Ellis had spoken to Browne. Ellis, however, did not recall making the following statements, to which Browne testified, "[Ellis] recalls that the tank was losing product. The excavators cut open the tank from the top and then washed the tank out before removing it. He does not recall any spill from the tanks when they were removed."
The testimony of plaintiffs' two expert witnesses, Matthew Wristbridge and Donald Bello, contradicted much of Weed's testimony. Wristbridge, an employee of Tank Management, Inc., stated that based upon the length and size of the pipe running from the pump to the tank, approximately six gallons of gasoline could be contained in the pipe allegedly disconnected by Casie. This was in stark contrast to Weed's estimate that 50 gallons of gasoline had spilled out of the pipe allegedly broken by Casie. Wristbridge also confirmed that it was his understanding that the spill occurred from a tank which ruptured as it was being removed from the hole, and not while the tank was in the ground. Additionally, Wristbridge stated that the tanks which had been removed in 1987 and 1989 were made of bare steel which were rusty and had no modern features such as leak protection. He explained that he had taken soil samples from the premises prior to excavating three tanks in 1989, and that these findings indicated contamination throughout the premises, not just near the tank excavated by Casie. Indeed, a substantial amount of soil contamination was right under the area where the 4,000-gallon tank that held leaded gasoline had been.
Bello also testified on cross-examination that he had originally believed that the spill occurred while the tank was "on its way out of the hole," but he realized that he was incorrect in this understanding. He further admitted that his information concerning discharges at the site came only from Weed. Bello also confirmed that he advised the DEP that the hole found on the top of the tank *525 was a likely source of contamination. That statement was contrary to Bello's deposition testimony where he testified that there was no evidence that a release came from the hole on the top of the tank. Bello also conceded that he wrote in a report submitted to the DEP in December 1990 that "the owner of the facility has indicated that during the removal of the [underground storage tanks] at the Weed's facility performed on July 25, 1989, the removal contractor spilled an unknown quantity of residue fuel from one of the [underground storage tanks] into the [underground storage tank] excavation." Monitoring and remediation of the site, Bello testified, could cost up to $800,000.[3]
Defendant is in the business of removing and cleaning oil tanks, installing tanks, conducting groundwater remediation, and emergency spill response for the DEP. Rex Mouser, a Casie employee, testified that Weed's Texaco contacted Casie on May 13, 1987 for "tank cleaning and petroleum hydrocarbons ... and ... the removal of the tank off site" with the apparent understanding that the tank would first be exposed by Weed. The job did not include cleaning or the disconnecting of any of the pipes. If that had been an aspect of the job, such a charge would have been specifically included in the estimate and the "hard card" that was issued for the job by Casie.
Casie presented the testimony of James Smith, Ph.D., an environmental chemist who was the head of Trillium, Inc. Dr. Smith explained that after reviewing a sample taken from the site on April 8, 1993, numerous documents including deposition transcripts, a DEP file, Bello's reports and file, the data from Casie and two site visitations, he determined that the gasoline found in the "well" was leaded gasoline containing two tenths of a gram per gallon, an amount in excess of that which the law allowed for gasoline after January 1, 1986. Dr. Smith therefore concluded that the contamination found in that "well" did not come from the *526 3,000-gallon tank that was removed by Casie, nor from any alleged spillage during its removal. Finally, Dr. Smith concluded that the testing by Wristbridge's company Tank Management, Inc. conducted in 1989 showed that there was extensive contamination on the site which could not have come from Casie.
Felix Baega, a Casie employee, testified that he and two co-workers arrived at the site on May 16, 1987. Baega observed that the pipes had been broken with an unclean cut and had already been disconnected. The tank was cleaned in the ground before it was lifted out of the hole. There were no gasoline spills during the time that he was working on the site. Michael Grusemeyer, a former employee of Casie, corroborated the testimony of Baega.

I.
On September 23, 1991, plaintiffs filed their complaint against defendant. On September 8, 1992, after the deposition of Charles "Butch" Giovinazzi was taken, defendant sent a letter to plaintiffs alerting them that if the suit was not dismissed an application would be made under the frivolous litigation statute for reimbursement of fees and expenses.
After a six-day trial, the jury found in favor of defendant on November 17, 1993. The court subsequently entered an order of no cause of action. Plaintiffs did not make a motion for a new trial. On November 29, 1993, defendant filed a motion to compel plaintiffs to pay defendant's attorney fees, expert fees and costs of litigation pursuant to N.J.S.A. 2A:15-59.1. It was supported by a 16-page certification together with various exhibits and a brief. Plaintiffs responded with a cross-motion for attorney fees and costs for defending defendant's motion supported by an answering brief and a certification solely with respect to fees incurred in defending the motion.
After a hearing on December 17, 1993, the court found in favor of defendant and ordered plaintiffs Sanford Weed and Nancy Weed to pay defendant $92,514.24. Plaintiffs' cross-motion was *527 denied. On January 4, 1994, the order was amended to exclude Nancy Weed.
On January 19, 1994, plaintiffs filed a Notice of Appeal from both judgments. Defendant moved to dismiss plaintiffs' appeal as untimely. By order filed March 21, 1994, we denied the motion without prejudice.

II.
Defendant argues that the plaintiffs' appeal of the November 17, 1993 jury verdict and judgment of no cause of action was untimely because R. 2:4-1(a) provides in pertinent part that "Appeals from final judgments of courts ... shall be taken within 45 days of their entry." Plaintiffs' Notice of Appeal was not filed until January 19, 1994. Although the time for plaintiffs to appeal the jury verdict commenced on November 17, 1993, because that is the date the final judgment was entered, it was no longer final as to all issues and all parties when defendant filed its application for fees on November 29, 1993. See Yuhas v. Mudge, 129 N.J. Super. 207, 209, 322 A.2d 824 (App.Div. 1974). Therefore, the time for plaintiffs to appeal any order or judgment in the case began from the date of the last order, January 4, 1994. The appeal was thus timely.

III.
Plaintiffs argue that the trial court erred in charging the jury that either plaintiffs or defendant was lying, and in further commenting upon the prior inconsistent statements of Weed and Ellis, alleging that these statements were prejudicial to the extent of plain error, requiring a reversal. The specific portion of the trial court's charge to the jury at issue is:
There have been sharp disputes during the course of this trial. Witnesses have testified regarding the same facts and circumstances in contradictory fashion. I suggest to you, ladies and gentlemen, that someone or others have been playing fast and loose with the truth. In very plain language someone is lying in this case. It is impossible for there to be the diametrically opposed presentations if we were *528 hearing the truth from everyone. Now, it's your function to cull the facts and evidence and determine where the truth lies, who has been telling you the truth.
I can give you a number of examples to corroborate my assessment that we have had blatant lying in this case, but your recollection will determine whether that is correct and where, as I've said, the truth lies. You cannot have a situation such as here where Mr. Weed and his former employee say the tank was cleaned when it was up on the ground and the defendant's witnesses saying the tank was cleaned in the hole. There can be no mistaking on that. There are a number of such circumstances.
If, in fact, you find that the plaintiffs were telling the truth and that the defendant's employees hammered away at the union and broke it, that is absolutely diametrically opposed to what the defendants said they did and did not do at the scene. So you must assess with great care the credibility of these witnesses and determine what happened in May of 1987 at the Weed's Texaco station.
Plaintiffs' counsel made no exceptions to the charge so this alleged error was waived. R. 1:7-2. The obvious conclusion to be drawn from this failure to object is that plaintiffs' counsel did not deem any part of the charge to be unfairly prejudicial to his clients. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).
Because no objection was made to the charge, any such argument must now be examined under the "plain error" standard. R. 2:10-2. The plain error remedy has been called a "safety valve" which should be sparingly employed. Ford v. Reichert, 23 N.J. 429, 434-35, 129 A.2d 439 (1957). This is especially true given that the failure to object to an alleged error deprives the trial court of the ability to issue a curative instruction or a corrected charge. Dafler v. Raymark Industries, Inc., 259 N.J. Super. 17, 37, 611 A.2d 136 (App.Div. 1992), aff'd, 132 N.J. 96, 622 A.2d 1305 (1993). Plain error will only be found where it is of "sufficiently grievous nature to justify notice by the reviewing court and to convince the court that, of itself, the error possessed a clear capacity to bring about an unjust result." Jurman v. Samuel Braen, Inc., 47 N.J. 586, 590-91, 222 A.2d 78 (1966) (citation omitted).
The comment made by the trial court to the effect that one of the parties in the case was lying was well supported by the evidence, could not have confused or misled the jury and in no way *529 controlled their findings. While the trial judge stated that there had been blatant lying, he specifically stated in his charge that the jury's "recollection will determine whether that is correct and where ... the truth lies." Trial judges are permitted to comment on the evidence, Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 176, 406 A.2d 140 (1979); Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 128, 145 A.2d 306 (1958); Dafler v. Raymark Industries, Inc., supra, 259 N.J. Super. at 37, 611 A.2d 136, as long as it does not usurp or control the jury's findings of the facts. The trial judge made that clear in his instructions.
After carefully reviewing the entire charge, we are satisfied that the trial court at no time suggested that he believed one side over the other. His comments were an effort to assist the jury in analyzing the evidence, not an attempt to control their finding. There was no error, much less plain error.

IV.
Plaintiff, Sanford Weed, argues that there was no basis for the trial court's award to defendant of its attorney fees, expert witness fees and costs under the Act. He relies upon the fact that there is no reported case in which an award was made under the Act concerning a factual dispute involving a credibility decision by a jury. He further argues that the trial judge did not make the necessary findings required by the Act.
Defendant argues that this case involves an effort by an owner of contaminated property to fabricate a case to impose the cost of remediating such property onto an innocent victim who clearly was not responsible for such contamination. As a result of plaintiffs' allegations, defendant was forced to spend substantial amounts in attorney fees, expert fees and other expenses to defend itself from plaintiffs' claim which approached one million *530 dollars. The judge awarded defendant $92,514.24.[4]
The judge's findings of fact that supported the award included:
I was satisfied that one of the two parties was lying and that it was for the jury to determine who it was. If I was hearing this case or had heard this case without a jury, in all probability following the conclusion of the matter I would have submitted the record to the prosecutor. It was my reaction to the... plaintiff and his witness that at the very least false swearing had occurred, ... or perjury,... and I toyed with the idea after the jury's return to send the matter to the prosecutor. But when I was sensitized to the fact that this motion would, if granted, have as serious an impact upon the plaintiff as a proceeding under Title 2C, I felt comfortable in not forwarding the matter at that time and in addressing this motion.
I am still of the conviction as I was when the testimony ended that one of the parties had fabricated the facts surrounding this incident. The jury, responsive to the charge that had been given to it, concluded that that party was Mr. Weed, and I agree with their conclusion in that regard.
The evidence presented by Mr. Weed was designed to lead this jury to believe that the defendant's workmen had gone down into the hole in which the particular gasoline tank was located, which hole had been in effect dug out by workmen employed by Mr. Weed. They had prior to the arrival of Casie cleared the dirt from above and around the tank, and then and only then did Casie's people come to the job. And Mr. Weed would have had this jury believe that the Casie workmen went down into the hole and with sledgehammers banged away at a pipe that connected the tank to either the fill line, as I believe he said initially, but in actuality the line that led to the pump, and that banging away at this pipe Mr. Weed would have had this jury believe that the defendant, a professional environmental company, allowed a 50-gallon spill to occur with gasoline pouring into the hole unabated....
Mr. Weed indicated that he was standing right there and he saw it all, and he brought in Draper Ellis, his longtime employee and tenant, who indicated that he observed this incident as described by Mr. Weed and saw fuel pour out for 20 or 30 minutes. Now, Mr. Weed had said five or six minutes.... Mr. Ellis had the workmen who exposed the tank in the first instance there the same day as the Casie people when we know ... the Casie people didn't come until a day or two after the tank had been uncovered. Mr. Ellis further was exposed as having previously at a point in time shortly after this matter was brought to the attention of the defendant gave a prior statement in which he said he did not observe any spill. Now, an effort was made to put a spin on that devastating statement dealing with some semantics that I'm sure went over Mr. Ellis' head. But there was no question that Mr. Ellis was here to assist his longtime employer and landlord. He *531 didn't want to get involved he told the defendant's investigators, ... he didn't want to get involved. But when push came to shove ... Weed ... called upon this loyal friend and employee.
What was significant about the Weed position was not who he called upon, but who he did not call upon. Where was Mr. Giovinazzi, ... Mr. Zyndorf, ... Mr. Osbourne? Giovinazzi was the person who had been running the Texaco station ... yet Mr. Weed didn't... present Mr. Giovinazzi before this Court.
There was a dispute or a disparity in testimony regarding whether it was Michael Zyndorf or Brian Osbourne who had exposed the tank, who had dug it out. Whomever it was was the person in the best position to testify as to what occurred when they were digging out that tank. If I had been requested, I probably would have given an adverse inference charge for the failure to have produced Zyndorf and/or Osbourne....
Now, what I have said probably in and of itself was sufficient to suggest that Mr. Weed was fabricating this story, but there are other factors that one cannot ignore. Firstly, if there had been a 50-gallon spill ... which his own expert ... indicated at best it was 5 or 6 gallons, why wasn't the spill... reported to DEPE ...? What explanation other than a fabricated story can we find for the absurd position that Mr. Weed was advancing that there was leaded gasoline in this tank, that there was unleaded gasoline in this tank, that there was leaded gasoline after the proofs discovered by the defendant showed that it was leaded when the fact of the matter was he knew that for a number of years and that he had certified to DEPE that this was unleaded gasoline in this tank?
The evidence was replete and overwhelming with a demonstration that Mr. Weed had fabricated this story.... [H]is motive in fabricating this story... was ... obvious: He had already incurred... significant expense under direction from DEPE to clean up this location and to maintain monitoring wells to make certain that the contaminants did not spread ... and somehow Mr. Weed came up with the notion that Casie could be his patsy....
* * * * * * * *
When a plaintiff or a defendant asserts by way of affirmative claim, one that is totally fabricated, as I find this to have been, I can but conclude that it was commenced in bad faith and was designed to maliciously injure the defendant. Maybe Mr. Weed thought ... some insurance company will pay this loss, and it's spread around broadly.... Casie wasn't insured and has taken it on the chin....
* * * * * * * *
One last factor that the Court must consider when assessing fees is the ability of the ... party to pay. I haven't seen Mr. Weed's net worth statement. All I have heard was of the various businesses that he owns and valuable real estate that he owns in this county, and it would seem to me that it is a sufficient demonstration of his financial wherewithal to support this award.
*532 To find that a pleading was frivolous under N.J.S.A. 2A:15-59.1b, the judge has to determine on the basis of the pleadings, discovery, or the evidence presented that:
(1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
(2) The nonprevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
The legislative purpose of this statute is to deter frivolous litigation. However, "[t]he legislative history [of N.J.S.A. 2A:15-59.1] makes clear that the Legislature intended that false allegations of fact would not justify the award of counsel fees, unless they are made in bad faith, `for the purpose of harassment, delay or malicious injury.'" McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561, 626 A.2d 425 (1993) (quoting N.J.S.A. 2A:15-59.1b(1)).
The plaintiff's argument that it was significant that no motion for summary judgment was made by the defendant is misguided. In determining a motion for summary judgment, a court does not weigh evidence or determine matters of credibility. Instead, it assesses the evidence in the record to determine whether the facts, if accepted as true, create a genuine issue of material fact. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954). In this case, plaintiff's statements about the happening of the spill, even though contradicted by his own statements and actions and by other evidence in the record, were sufficient to create an issue of material fact for purposes of defeating a motion for summary judgment if made by the defendant. On the other hand, when considering whether a lawsuit is frivolous, i.e., fabricated to assert an otherwise proper cause of action, the totality of the evidence must be considered. Because the nature of the inquiry is entirely different, the question of whether or not summary judgment could have been *533 granted has no bearing upon whether plaintiff's fabricated assertions constitute a frivolous lawsuit.
There is substantial credible evidence in the record to support the judge's findings that an award of attorney fees, expert witness fees and expenses was justified under N.J.S.A. 2A:15-59.1b(1). Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Plaintiff's argument that the trial court should have held a plenary hearing concerning the amount of the fees and expenses and that expert witness fees are not permitted under the Act is clearly without merit. R. 2:11-3(e)(1)(E). Plaintiff received an appropriate hearing on these issues.
"Adequate notice and the right to a hearing are fairly implicit in N.J.S.A. 2A:15-59.1." McKeown-Brand, supra, 132 N.J. at 559, 626 A.2d 425 (citing Fagas v. Scott, 251 N.J. Super. 169, 221, 597 A.2d 571 (Law Div. 1991)). An application under the Act must "be followed by an appropriate hearing." Ibid. Having been provided with the affidavit of counsel for defendant regarding attorney fees and expenses and the bills of Trillium, Inc. for expert fees plaintiff never, either before or during the oral argument on the motion, expressed any need or desire to explore the propriety of these expenses through discovery or live testimony. Without such a request, a plenary hearing was not required.
Furthermore, the legal fees and associated expenses were well documented in the certification of defense counsel, and the court was fully able to understand these items as it had presided over the trial. The only objection to these items raised by the plaintiff was that defense counsel took too many depositions. The court quickly responded that in light of the complexity of the matter and the degree of exposure, "[i]f [defense counsel] had done anything less than he did in preparing this case, he would have exposed himself and his client to very dangerous and perhaps disastrous results."
*534 With respect to the amount sought for expert witness fees, plaintiff's counsel expressed no objection to the work performed by such experts nor to their fees. There were detailed statements submitted with respect to the expert fees and at no time did plaintiff request any additional information regarding the work performed by them. Although during the hearing plaintiff's counsel commented that he had no way of rebutting their hourly rates, he clearly had the opportunity to seek discovery and/or to submit certifications regarding the fees. Not having presented such evidence, and not having raised an issue with respect to the propriety of the amount of fees sought, plaintiff's argument, made for the first time during this appeal, that a plenary hearing should have been held is too late. Accordingly, the court's ruling with respect to the payment of expert fees and expenses and the amount thereof was not an abuse of discretion. See Velli v. Rutgers Casualty Insurance Co., 257 N.J. Super. 308, 312, 608 A.2d 431 (App.Div. 1992), certif. denied, 130 N.J. 597, 617 A.2d 1220 (1992).
This was not honest and creative advocacy which should not be discouraged. Iannone v. McHale, 245 N.J. Super. 17, 28, 583 A.2d 770 (App.Div. 1990). Rather, as the trial judge found, it was a total fabrication "commenced [by plaintiff] in bad faith and was designed to maliciously injure the defendant" for the purpose of harassing defendant to pay up to one million dollars which plaintiff knew he had no right to seek or obtain.
Affirmed.
NOTES
[1] Defendant, Casie Ecology Oil Salvage, Inc., was improperly designated in the complaint as Casie Enterprise, a division of Rezultz, Inc.
[2] The name of the agency was changed to the Department of Environmental Protection and Energy (DEPE), effective June 20, 1991. In July 1994, the name was changed back to the Department of Environmental Protection.
[3] The judge limited the amount of damages that the jury could award to approximately $830,000.
[4] Although this is the figure in the order, the judge in his oral opinion awarded attorney fees of $43,858.65 together with expenses of $6,766.06 and expert fees of $41,659.82 and expenses of $129.71, which totals only $92,414.24.