**Jon BURGER and Lois Burger, H/W, Appellant**

v.

**OWENS ILLINOIS, INC., Crown Cork & Seal Company, Inc., Dap, Inc. and Pneumo Abex LLC, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 4, 2008.
Filed Feb. 11, 2009.

Robert E. Paul, Philadelphia, for appellant.

Anne L. Wilcox, Pittsburgh, for Pneumo, appellee.

Eric J. Kadish, Philadelphia, for Owens, appellee.

Mathieu J. Shapiro, Philadelphia, for Crown Cork, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, MUSMANNO, ORIE MELVIN, LALLY–GREEN, KLEIN, GANTMAN, PANELLA, and DONOHUE, JJ.

OPINION BY STEVENS, J.

¶ 1 Following settlement and the entry of judgment on September 13, 2006, with regard to the last remaining defendant in a mass asbestos products liability action, Appellants Jon and Lois Burger present challenges to the orders entered in the Court of Common Pleas of Philadelphia County granting summary judgment in favor of four manufacturers, Crown Cork & Seal Company (hereinafter Crown Cork), DAP, Inc. (hereinafter DAP), Pneumo Abex LLC (successor by merger to Pneumo Abex Corporation) (hereinafter Pneumo Abex), and Owens–Illinois, Inc. (hereinafter Owens–Illinois). We affirm.

¶ 2 The relevant facts and procedural history are as follows: On February 3, 2006, Appellants Jon and Lois Burger filed a complaint against Appellees[1] alleging Mr. Burger suffers from mesothelioma[2] from the inhalation of asbestos fibers. Mr. Burger alleged he was exposed to asbestos from January 1, 1954 to January 1, 1956 when he worked at New York Shipyard in Camden, New Jersey (hereinafter New York Ship) as an electrician, from January 1, 1956 to January 1, 1997 when he worked at Public Service Electric & Gas Company as an engineer plant supervisor, and from 1956 to 1997 when he performed brake repairs at Bill Boll's Auto Repair in Sewell, New Jersey.

¶ 3 On July 19, 2006, Appellees filed motions for summary judgment. Specifically, Crown Cork, who once owned the Mundet Cork Company (Mundet Cork), which operated an asbestos insulation business, did not contest that Mr. Burger was exposed to asbestos from Mundet Cork's product when he worked at New York Ship.[3] However, Crown Cork sought sum-

---

1. The Burgers sued numerous other companies; however, the claims against the remaining companies were either dismissed or otherwise settled and are not at issue in the case *sub judice.*

2. We note that "mesothelioma is a cancer of the mesothelial tissue surrounding the lung, which is a rare disease with the exception of those exposed to asbestos." *Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 652 (Pa.Super.2002) (quotations, quotation marks, and citation omitted). Therefore, Mr. Burger has a disease which is medically attributable specifically to exposure to asbestos or asbestine products. *See id.*

3. We note that, on February 7, 2002, Crown Cork filed a global summary judgment motion in the trial court requesting dismissal as to all cases then pending in which the plaintiffs sought damages for asbestos-related injuries due to exposure from Mundet Cork products. Specifically, Crown Cork sought summary judgment pursuant to 15 Pa.C.S.A. § 1929.1 and the trial court granted the order. However, in *Ieropoli v. AC&S Corporation,* 577 Pa.

138, 842 A.2d 919 (2004), the Supreme Court held that 15 Pa.C.S.A. § 1929.1 was unconstitutional under the Remedies Clause (Article I, Section 11) because it extinguished existing causes of action. Thereafter, the legislature enacted 42 Pa.C.S.A. § 5524.1(b) to correct the Remedies Clause violation. Specifically, Section 5524.1(b) states that the Statute does not bar claims where the statute of limitations commenced on or before the Statute's effective date. In the case *sub judice,* there is no disputed Remedies Clause violation. Moreover, we note that, in response to the enactment of Section 5524.1(b), Crown Cork filed another global summary judgment motion as to all asbestos cases in which suit was filed after December 17, 2003, and by order filed on July 29, 2005, the trial court granted the summary judgment motion. Thereafter, Crown Cork filed the instant summary judgment motion as to the Burgers, as well as other plaintiffs, including Bruce Johnson (Administrator of the Estate of Thornton Johnson), Dorothy Mauger (Executrix of the Estate of Russell Mauger), Dolores Stea (Administratix of the Estate of Joseph Sea and in her own right), and Robert Vanaman (Executor of the

mary judgment on the basis the Burgers' claims were barred by 15 Pa.C.S.A. § 1929. 1,[4] 42 Pa.C.S.A. § 5502,[5] and 42 Pa.C.S.A. § 5524. 1.[6] On the other hand, DAP, Pneumo Abex, and Owens–Illinois alleged there was no evidence that Mr. Burger inhaled the fibers of any asbestos-containing product, which was manufactured or sold by any of the three companies.

¶ 4 The Burgers filed responses to the motions for summary judgment, and the trial court entered summary judgment orders in favor of Appellees.[7] The Burgers filed timely notices of appeal to this Court after the claims against the remaining defendants were settled. By orders entered on October 27, 2006, the Burgers were directed to file Statements pursuant to Pa.R.A.P.1925(b), the Burgers timely complied, and the trial court filed a Pa.R.A.P. 1925(a) opinion.[8] Thereafter, this Court *sua sponte* listed this case for *en banc* consideration.

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

As already noted, on appeal from a grant of summary judgment, we must

Estate of Violet Vanaman and in his own right), whose appeals are being decided in separate *en banc* opinions.

4. 15 Pa.C.S.A. § 1929.1 limits the asbestos-related liability of Pennsylvania corporations when that liability arises from a merger or consolidation. In general, the Statute caps the successor corporation's asbestos-related liability at the fair market value of the prior company as of the time of the merger or consolidation. In the case *sub judice*, due to Crown Cork's purchase of Mundet Cork, Crown Cork has paid hundreds of millions of dollars in asbestos-related claims, the value of which far exceeds the fair market value of Mundet Cork. Therefore, Crown Cork's liability is limited by Section 1929.1 in this case.

5. 42 Pa.C.S.A. § 5502 sets forth the method of computing periods of limitation generally.

6. 42 Pa.C.S.A. § 5524.1 sets forth, in relevant part, that "[t]he limitations set forth in 15

Pa.C.S.A. § 1929.1(a) and (b) (relating to limitations on asbestos-related liabilities relating to certain mergers or consolidations) shall not apply to an asbestos claim for which the applicable period of limitation commenced on or before December 17, 2001."

7. The Burgers filed appeals immediately from the entry of the summary judgment orders; however, this Court quashed the appeals as interlocutory.

8. In its Pa.R.A.P.1925(a) opinion, the trial court explained the reasons summary judgment was granted on the basis of lack of product identification and/or exposure regarding DAP, Pneumo Abex, and Owens–Illinois. Regarding the constitutional challenges to the statutes limiting Crown Cork's liability, the trial court relied on its opinion in *Johnson v. American Standard*, 966 A.2d 573, 2009 WL 281177 (Pa.Super.2009) (*en banc*), which has been addressed in a separate *en banc* Opinion.

examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 651 (Pa.Super.2002) (citations omitted).

¶ 5 Regarding the entry of summary judgment in favor of Crown Cork, the Burgers allege the following: (1) The trial court improperly granted summary judgment in favor of Crown Cork since 15 Pa.C.S.A. § 1929.1 is unconstitutional in that it created a one-member, closed class in violation of Pennsylvania's Equal Protection Clause, Article III, § 32, and is discriminatory as to other corporations; [9] and (2) The trial court improperly granted summary judgment in favor of Crown Cork since 15 Pa.C.S.A. § 1929.1 interferes with the Commerce Clause and protects in-state corporations at the expense of out-of-state corporations, which do business in Pennsylvania. We conclude the Burgers lack standing to raise these constitutional challenges.

¶ 6 As discussed *supra*, Crown Cork filed a motion for summary judgment in another case, *Johnson v. American Standard*, 966 A.2d 573, 2009 WL 281177 (Pa.Super.2009) (*en banc*), for which an Opinion has been filed by the present *en banc* panel. Writing for the Majority, our esteemed colleague, the Honorable Maureen Lally–Green, has explained that an appellant must have standing to challenge whether 15 Pa.C.S.A. § 1929.1 is unconstitutional as applied to Crown Cork. For the reasons discussed in *Johnson*, we conclude that the Burgers in the case *sub judice* lack standing to raise their constitutional challenges and we decline to address the constitutional issues further.[10]

¶ 7 The Burgers remaining claims relate to the trial court entering summary judgment in favor of DAP, Pneumo Abex, and Owens–Illinois on the basis the Burgers did not present evidence establishing a genuine issue of material fact as to product identity and/or exposure to asbestos.

To survive a motion for summary judgment in an asbestos case, a plaintiff must meet the following standard:

In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he

---

9. To the extent the Burgers suggest Senator Stack, who explained Crown Cork's economic woes during the passing of Section 1929.1, should have disclosed his father's representation of Crown Cork in asbestos cases, we find any issue with regard thereto to be waived. Aside from making a passing reference to Senator Stack's comments to the General Assembly, and Senator Stack's father's representation, the Burgers have not developed this claim in their brief, and there is nothing in the record to indicate any impropriety. *See* Pa.R.A.P. 2119.

10. We note that the Burgers claim the trial court erred in concluding the coordinate jurisdiction rule prevented the court from revisiting issues concerning the constitutionality of 15 Pa.C.S.A. § 1929.1. Assuming, *arguendo*, the Burgers are correct, we conclude that no relief is due since the Burgers have not demonstrated they have standing to raise their constitutional issues.

inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper [as to the manufacturer] when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury.

Whether direct or circumstantial evidence is relied upon, our inquiry, under a motion for summary judgment [filed by a manufacturer], must be whether plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant.

*Gutteridge,* 804 A.2d at 652 (quotations, quotation marks, and citations omitted). *See Donoughe v. Lincoln Electric Co.,* 936 A.2d 52 (Pa.Super.2007) (holding that, in a products liability case involving asbestos exposure, a plaintiff must present evidence he inhaled asbestos fibers shed by the defendant's product).

¶ 8 Moreover, with regard to causation, in *Gregg v. V–J Auto Parts Company,* 596 Pa. 274, 943 A.2d 216 (2007), our Supreme Court explained the appropriate application of the "frequency, regularity, and proximity" criterion to asbestos product cases at the summary judgment stage. Specifically, the Supreme Court held:

> [W]e believe that it is appropriate for courts, at the summary judgment stage,

to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Gregg,* 596 Pa. at 292, 943 A.2d at 227.[11]

■ ¶ 9 Regarding the entry of summary judgment in favor of DAP, Mr. Burger's deposition testimony established that Mr. Burger used caulking, sealants, and a window glazing compound, which were manufactured by DAP, when he did home repairs. Deposition of Jon Burger, dated 3/3/06, at 233–245. However, Mr. Burger's deposition testimony established that he did not know whether any of the products contained asbestos in that he did not read any of the labels. Deposition of Jon Burger, dated 2/28/06, at 120–121; Deposition of Jon Burger, dated 3/3/06, at 233–237. Mr. Burger indicated the window glazing compound was sold in a can, and he was exposed to dust when he sanded the window glazing compound and cleaned it off his tools after it had dried. Deposition of Jon Burger, dated 3/3/06, at 233–234, 245–246. He further testified the sealant would get on his hands, and he would inhale dust when he removed old caulking. Deposition of Jon Burger, dated 3/3/06, at 236, 244–245. He indicated that he used the caulking approximately once a year. Deposition of Jon Burger, dated 3/3/06, at 236.

---

11. Following *Gregg,* in *Tarzia v. American Standard,* 952 A.2d 1170 (Pa.Super.2008) (*en banc* ), this Court examined whether the entry of summary judgment in favor of a manufacturer was proper. In concluding the plaintiff failed to demonstrate that he was exposed to asbestos from the manufacturer's brake shoes, this Court stated, "In *Gregg,* the Su-

preme Court essentially adopted the *Eckenrod [v. GAF Corp.],* [375 Pa.Super. 187] 544 A.2d 50 (Pa.Super.1988), test in determining whether a person has been exposed to asbestos, frequency, regularity, and proximity must be considered." *Tarzia,* 952 A.2d at 1171 (footnote omitted).

¶ 10 Based on the aforementioned deposition testimony, DAP filed its summary judgment motion on the basis that, while Mr. Burger identified various DAP products to which he was exposed, Mr. Burger presented no evidence that any of the products contained asbestos. Therefore, DAP asserted that the Burgers presented no facts supporting the conclusion Mr. Burger inhaled asbestos fibers, which were shed by a DAP product.

¶ 11 In their opposition to DAP's summary judgment motion, the Burgers acknowledged that Mr. Burger testified he did not know whether any of the products contained asbestos. However, counsel asserted that, after the deposition, since no one had asked Mr. Burger whether he recalled the specific trade name of any of DAP's products, counsel presented Mr. Burger with a list of DAP products and asked him whether he could identify any of the products. Mr. Burger identified DAP 33 Glazing Compound as a DAP product, which he had used. The Burgers attached to their response a notarized affidavit from Mr. Burger which provided in pertinent part:

> JON BURGER, being duly sworn upon his oath deposes and says:
>
> 1. He had been made aware of the motions for summary judgment filed by various defendants and wishes to clarify testimony which he would have given at deposition if asked.
> 2. He recalls exposure to the products of DAP checked off on the attached list.

¶ 12 The Burgers also attached a list of products,[12] which DAP apparently provided during discovery, and Mr. Burger circled "33 Glazing." In response, DAP filed a reply arguing that Mr. Burger's affidavit was contrary to his deposition testimony, and therefore, should be disregarded as "wholly incredible."

¶ 13 The trial court determined that Mr. Burger's affidavit and the attached list of products, on which Mr. Burger circled "33 Glazing," was insufficient to overcome the entry of summary judgment. Specifically, the trial court indicated:

> Despite Burger's failure over six days of deposition testimony to identify any asbestos containing DAP product to which he was exposed, in response to summary judgment, Plaintiffs submitted Jon Burger's affidavit wherein he swore that had he been asked at deposition he would have testified to exposure to DAP products identified on the attached list. *See* Plaintiff's Response, Exhibit E. In the face of Burger's failure to identify any asbestos products made by DAP over the course of a six day deposition, this Court found that Burger's affidavit was incredible and patently self-serving. "[A] trial court may disregard an affidavit when it is not 'wholly credible.' " *Gruenwald v. Advanced Computer,* 730 A.2d 1004, 1009 (Pa.Super.1999); *Lucera v. Johns–Manville Corp.,* [354 Pa.Super. 520] 512 A.2d 661, 666 (Pa.Super.1986). The mere fact that DAP made asbestos products fails to establish that [Mr.] Burger actually inhaled asbestos fibers when his testimony demonstrates otherwise. Thus, summary judgment in DAP's favor was warranted.

Trial Court Opinion filed 7/11/07 at 6 (citation omitted).

¶ 14 On appeal, the Burgers contend the trial court erred in making a credibility determination regarding Mr. Burger's affidavit. That is, the trial court should have accepted the affidavit in the light most

---

12. The list was a Departmental Correspondence regarding the asbestos status of various products. "33 Glazing" was identified as not containing asbestos fibers as of June 26, 1977.

favorable to the Burgers and concluded the affidavit, at the very least, presented a genuine issue of material fact as to whether Mr. Burger inhaled fibers from the asbestos containing product, DAP 33 Glazing Compound. The Burgers note that Mr. Burger's affidavit supplemented, but did not contradict, Mr. Burger's deposition testimony, and therefore, pursuant to Pennsylvania Rule of Civil Procedure 1035.3, the affidavit and list were properly attached to the Burgers' motion in opposition to the entry of summary judgment.[13]

¶ 15 There is no doubt that Rule 1035.3 permits a party to supplement the record when it files a motion in opposition to the entry of summary judgment. As our Supreme Court stated in *Gerrow v. John Royle & Sons,* 572 Pa. 134, 813 A.2d 778 (2002) (plurality), which was expressly adopted by this Court in *Reeves v. Middletown Athletic Assoc.,* 866 A.2d 1115 (Pa.Super.2004), and *Kurian v. Anisman,* 851 A.2d 152 (Pa.Super.2004):

Rule 1035.3 (response to motion for summary judgment) states: '(b) An adverse party may supplement the record or set forth the reasons why the party cannot present evidence essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence.' Pa.R.Civ.P. 1035.3(b). Both the timing and scope of the supplementation are at issue. The Superior Court interpreted the rule broadly. We hold that the rule, read *in pari material,* with Rule 1035.2 (motion for summary judgment) and the Note and Explanatory Comment, does permit the supplementation which was attempted by [the plaintiff].

Rule 1035.2 reads:

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law: whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

if, after the completion of discovery relevant to the motion, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to the jury.

\* \* \*

Special note should be taken of the requirement under Rule 1035.2(2) that the motion be made after completion of discovery relevant to the motion.... While 1035.2(2) is prefaced with the statement that any party may file a motion after the relevant pleadings have closed, the adverse party must be given adequate time to develop the case and the motion will be premature if filed before the adverse party has completed discovery relevant to the motion. The purpose of the rule is to eliminate cases prior to trial where a party cannot make out a claim or defense after relevant discovery has been completed; the intent is not to eliminate meritorious claims prematurely before relevant discovery has been completed.

The timing of the motion is important.... Under Rule 1035.2(2), the mo-

---

**13.** The Burgers contend that if DAP objected to Mr. Burger's affidavit DAP should have asked to re-depose Mr. Burger. Aside from making this bald assertion, the Burgers have not developed this claim on appeal, and therefore, we decline to address it further. Pa. R.A.P. 2119.

tion is brought 'after the completion of discovery relevant to the motion.'

New Rule 1035.2 provides that a party may move for summary judgment after the 'relevant' pleadings are closed and, in order to provide discretion in the lower court, within such time so as not to unreasonably delay the trial.

Since the intent of the motion for summary judgment is not to eliminate meritorious claims that could be established by additional discovery ..., it is consistent with that intent to permit supplementation of the record under Rule 1035.3(b) to allow the record to be enlarged....We regard this as being squarely within the scope of the supplementation permitted by Rule 1035.3(b) in response to a motion for summary judgment.

*Gerrow*, 572 Pa. at 138–140, 813 A.2d at 781–82 (citation and emphasis omitted).[14]

¶ 16 Having concluded the record may be supplemented and enlarged in order to avoid the entry of summary judgment, the question remains whether Mr. Burger's affidavit, and accompanying list of DAP asbestos products, were a proper vehicle for so doing and whether the trial court properly disregarded the supplementation as being "wholly incredible." In reviewing these issues, we examine the following relevant case law:

¶ 17 In *Lucera v. Johns–Manville Corp.*, 354 Pa.Super. 520, 512 A.2d 661 (1986), Lucera was diagnosed with asbestosis in 1972 after filing a disability claim. On cross-examination at trial, Lucera read into the record the following excerpt from the 1972 disability form, under the block number asking for "Cause of Injury," in which Lucera stated, "I have been exposed to asbestos material which I work with at Philadelphia Naval Shipyard." Lucera also testified that he first became aware he had the beginnings of asbestosis in 1972 but claimed he was not aware his injury was caused by the conduct of another party until 1975–1976.

¶ 18 After trial, in answer to a motion for summary judgment, Lucera attached an affidavit stating that he did not know in 1971 or 1972 that his asbestosis was caused by the conduct of another party.[15] In granting the defendant's motion for summary judgment, the trial court opined, "The affidavit ... strains the chords of credibility, as it appears to totally contradict [Lucera's] testimony at the non-jury trial." *Lucera*, 512 A.2d at 667 (quotation omitted). On appeal, this Court found no abuse of discretion in the trial court disregarding the affidavit and granting the defendant's motion for summary judgment because Lucera's affidavit was not "wholly credible."

¶ 19 Following *Lucera*, in *Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004 (Pa.Super.1999), the appellees filed a motion for summary judgment in a breach of contract/misappropriation of trade secrets/fraud case, and Gruenwald, who was the appellant, filed a response, to which he attached a personal affidavit, a portion of his deposition testimony, and a handwritten note, which was signed by one of the defendants. This Court held that:

> [A] party moving for summary judgment may not rely exclusively upon oral

---

**14.** Although the issue in *Gerrow, Reeves,* and *Kurian* related to attempts to supplement the record with expert reports in order to avoid the entry of summary judgment, we find the reasoning discussed therein to be persuasive.

**15.** Lucera's case went to a non-jury trial and the court dismissed the case based on the statute of limitations. Lucera filed an appeal for a new trial, which was a proper procedure at the time, and the defendant filed a motion for summary judgment.

testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact. However, the nonmoving party may respond to the motion by relying solely on an affidavit to create a genuine issue of material fact, i.e., a credibility determination for the jury. *See Johnson v. Harris,* [419 Pa.Super. 541] 615 A.2d 771, 775 (Pa.Super.1992) (stating that a party responding to a motion for summary judgment may not rest on pleadings; '[r]ather, it is his responsibility to show that a genuine issue of fact exists by affidavit or otherwise.'). Therefore, to the extent that Gruenwald argues that his affidavit is an appropriate response to [the appellees'] summary judgment motion, we agree. We note, however, that a trial court may disregard an affidavit when it is not 'wholly credible.'

*Gruenwald,* 730 A.2d at 1009 (footnote, citations, quotations, and quotation marks omitted) (opining that a trial court may disregard an affidavit, sworn in response to a motion for summary judgment, when it directly contradicts a fact, such as the minutes of a meeting, and the court therefore finds it not wholly credible).

¶ 20 In *Stephens v. Paris Cleaners, Inc.,* 885 A.2d 59 (Pa.Super.2005), Stephens was burned at work when his polyester blend uniform was ignited by flames shooting out of a machine. Stephens sued numerous companies, who manufactured and supplied work uniforms to his employer. Following extensive discovery, the defendants filed motions for summary judgment on the basis that Stephens could not identify during his deposition which uniform he was wearing on the day of the incident. Specifically, during his deposition, when asked, "Do you know which uniform you put on that day, whether it was a new one or a used one?", Stephens responded, "No, I can't remember." *Stephens,* 885 A.2d at

64 (quotation omitted). When he was asked, "And the shirt you were wearing on the day of the explosion, was that a short-sleeve or long-sleeve shirt?", Stephens answered, "I had a mixture of both of them, but I can't recall if it was long or short." *Stephens,* 885 A.2d at 64 (quotation omitted). Finally, when he was asked, "Can you describe what emblems you recall seeing on your pants, your uniform pants?", Stephens replied, "I never really look at them. I can't really describe them to you. I never looked at them in detail." *Stephens,* 885 A.2d at 64 (quotation omitted).

¶ 21 In response to the motion for summary judgment, Stephens filed an affidavit averring that, after his deposition, he conducted research in the form of viewing the uniform manufacturers' catalogs and internet sites so that he could refresh his recollection. *See id.* As a result, he swore in his affidavit that he could identify a certain defendant as the manufacturer of his shirt and pants and a different defendant as the manufacturer of his coveralls. The trial court struck and disregarded the affidavit on the basis the affidavit directly contradicted Stephens' deposition testimony. On appeal, citing to *Lucera* and *Gruenwald,* this Court concluded the trial court did not err in striking the affidavit since it was directly contradictory to Stephens' deposition testimony, and therefore, not "wholly credible."

¶ 22 Based on a review of the aforementioned authorities, we conclude that a party may file an affidavit to supplement the record in order to avoid the entry of summary judgment. However, the trial court may then properly disregard the affidavit, and other exhibits, if it is not "wholly credible." To this end, the trial court must determine whether the information contained in the affidavit is inherently incredible. *See Ackler v. Ray-*

*mark Industries, Inc.,* 380 Pa.Super. 183, 551 A.2d 291 (1988) (holding an affidavit, which contradicts prior testimony, is so inherently incredible that it should be disregarded in opposition to the entry of summary judgment).

¶ 23 In the case *sub judice,* Mr. Burger testified during his deposition that he used caulking, sealants, and a window glazing compound, which were manufactured by DAP. Mr. Burger indicated that he did not know whether any of the products contained asbestos as he did not read the labels. In material provided to the Burgers during discovery, DAP revealed that some of its products contained asbestos until a certain date. In opposition to the entry of summary judgment, the Burgers averred that no one asked Mr. Burger to identify any products by name and, to that end, he reviewed the discovery materials provided by DAP. He then provided his affidavit in which he stated he recalled using DAP products, which were checked off on an attached list, which DAP provided during discovery. On the attached list, Mr. Burger identified "33 Glazing."

¶ 24 We conclude that the information provided by Mr. Burger in his affidavit, and accompanying list, was not contradictory to Mr. Burger's deposition testimony, or any other evidence, and therefore, could not, *per se,* be deemed to be "wholly incredible" by the trial court. That is, while Mr. Burger testified he did not know whether the products contained asbestos, he was never asked during his deposition whether he could identify any of the products by name. For the first time, in his affidavit and accompanying exhibit, Mr.

Burger identified by name "33 Glazing," which discovery information revealed contained asbestos until June 26, 1977. Since the exhibits provided new information, we conclude the trial court erred in refusing to consider the affidavit and list on the basis such was not "wholly credible." [16]

■ ¶ 25 Having concluded the trial court erred in striking Mr. Burger's affidavit and exhibit, we consider whether the Burgers presented a genuine issue of material fact as to whether Mr. Burger inhaled fibers from an asbestos-containing product, which was manufactured by DAP.

¶ 26 Through his affidavit and accompanying list of asbestos-containing DAP products, Mr. Burger identified "33 Glazing" as a product which he used. *See Harahan v. AC & S, Inc.,* 816 A.2d 296 (Pa.Super.2003) (utilizing an exhibit which was attached to a motion for summary judgment in determining whether there was a genuine issue of material fact as to whether an appellee's product caused the appellant's disease). The accompanying list indicates the elimination of asbestos fibers was completed as of June 26, 1977.

¶ 27 While we conclude that the Burgers have established a genuine issue of material fact regarding product identification, i.e., that Mr. Burger used DAP's "33 Glazing" compound, we further conclude the Burgers failed to present any evidence that the glazing compound contained asbestos when Mr. Burger used it. Even considering the list attached to Mr. Burger's affidavit, the asbestos fibers were removed from DAP's "33 Glazing" as of June

---

16. Although not presented in the trial court below, DAP provides this Court with additional reasons as to why we should affirm the trial court's summary judgment order. Namely, DAP raises various new arguments as to why the trial court did not err in declining to consider Mr. Burger's affidavit and the exhibits attached to the Burgers' motion in opposition to summary judgment. In light of our conclusion *infra* that summary judgment was properly entered in favor of DAP on an alternate basis, we find it unnecessary to address these issues further.

26, 1977; however, the Burgers have cited to no place in the record where they presented evidence regarding the time period Mr. Burger used the glazing compound. Simply put, although they have presented evidence Mr. Burger used, and DAP manufactured a product called "33 Glazing, which contained asbestos until June 26, 1977, they have not pointed this Court to any evidence as to whether Mr. Burger used the "33 Glazing" before or after the asbestos was eliminated. *See Tarzia, supra* (indicating the evidence must present a genuine issue of material fact that the fibers, which were inhaled by the plaintiff, contained asbestos). Therefore, the evidence does not present a jury with a genuine issue of material fact that Mr. Burger was exposed to asbestos when he used DAP's window glazing compound, and we conclude the trial court properly entered summary judgment in favor of DAP.[17]

■ ¶ 28 Regarding the entry of summary judgment in favor of Pneumo Abex, the Burgers allege they presented a genuine issue of material fact as to whether Mr. Burger inhaled asbestos fibers from an asbestos-containing product, which was manufactured by Pneumo Abex. Specifically, the Burgers allege that Mr. Burger frequently used and inhaled dust from asbestos-containing Genuine Auto Parts brake shoes, which were sold by NAPA stores and whose lining was manufactured by Pneumo Abex.

¶ 29 During his deposition, Mr. Burger testified he performed automotive repairs and, from the early 1950's to the early 1980's, he used brakes from Ford, Chrysler, General Motors, Pep Boys, and NAPA stores. Deposition of Jon Burger, dated 3/29/06, at 42. He testified that he purchased products from NAPA stores, and in particular, he purchased brake shoes for friends for their cars. Deposition of Jon Burger, dated 3/22/06, at 632–33. During the thirty years that he performed brake changes, Mr. Burger used brakes purchased from NAPA whenever brakes from a Pep Boys store were not available. Deposition of Jon Burger, dated 3/29/06, at 49. He used brake shoes purchased from NAPA, "[a]s the need required." Deposition of Jon Burger, dated 3/29/06, at 47. He testified that it was common practice for him to "scruff up" the brake shoes before installing them, this action would produce dust, and Mr. Burger inhaled the dust. *Id.* at 633–34; Deposition of Jon Burger, dated 3/29/06, at 47.

¶ 30 Regarding the particular NAPA store, Mr. Burger indicated he recalled buying brake shoes from the Glassboro area NAPA store. Deposition of Jon Burger, dated 3/22/06, at 638–39. In particular, he specifically remembered purchasing brake shoes for his sister-in-law's car at the Glassboro area NAPA store, although he was unable to remember who manufactured the brake shoes, which he had purchased. *Id.* at 640–41. Mr. Burger was also unable to remember who had manufactured the brake shoes, which he removed from his sister-in-law's vehicle. *Id.* at 642. However, Mr. Burger remembered performing the brake shoe replacement on his sister-in-law's car in the late 1950's or early 1960's. *Id.* at 641–42. Regarding why Mr. Burger believed the brake shoes, which he purchased at NAPA contained asbestos, the following exchange is relevant:

Q: Would I be correct that the basis for your belief that these brakes contained asbestos was simply because that's what you believe brakes in general contained during that time period?

---

17. In light of this conclusion, we find it unnecessary to proceed to a "frequency, regularity, and proximity" causation analysis under *Gregg.*

A: That is correct.

Q: No other information?

A: No.

Q: No other personal knowledge?

A: No.

*Id.* at 642. *See* Deposition of Jon Burger, dated 3/29/06, at 46–47 ("Q: Why do you think [NAPA] brakes had asbestos? Q: The same reason as the other two [manufacturers], it was how brakes were made in that period. That's all."). Mr. Burger indicated that the brake shoes, which he purchased from the NAPA store, did not have a warning on the label indicating that he could get sick from using them, and no NAPA employee warned him about using the brakes. Deposition of Jon Burger, dated 3/29/06, at 47.

¶ 31 In opposition to their motion for summary judgment, the Burgers attached exhibits, including Genuine Auto Parts' objections and responses to interrogatories for an unrelated case originating in Indiana.[18] In their interrogatories, Genuine Auto Parts acknowledged it was a distributor and assembler of various replacement auto parts, including brakes shoes, and some, but not most, of the parts contained asbestos components in the past. With regard to brake shoes, beginning in the 1930's or 1940's, the brakes shoes contained asbestos. Genuine Auto Parts began using non-asbestos materials in its brake products in the 1970's and, by the late 1980's, non-asbestos brake shoes were sold for nearly all part numbers. By 2001, all brakes shoes were asbestos-free. Genuine Auto Parts acknowledged selling products to Indiana NAPA stores but noted that NAPA stores are independent retail stores, which are free to and do carry

other lines of automotive parts. In fact, prior to the mid–1990's, General Auto Parts did not distribute or label its products under the generic NAPA brakes brand. After the mid–1990's, General Auto Parts distributed brakes as NAPA Brake Parts and NAPA United. With regard to General Auto Parts' connection to Pneumo Abex, General Auto Parts admitted that, before 1980, it purchased brake lining material exclusively from Pneumo Abex, and thereafter, purchased the material from other companies on an "as needed" basis. Also, General Auto Parts occasionally distributed brake parts and lining material made by various manufacturers, including Pneumo Abex, although the practice varied from location to location.

¶ 32 Based on the aforementioned, we agree with the trial court that the Burgers failed to present a genuine issue of material fact as to whether Mr. Burger was exposed to asbestos-laden brake shoes, which were manufactured by General Auto Parts with asbestos linings supplied by Pneumo Abex. While the evidence supports the conclusion General Auto Parts sold asbestos-laden brake shoes, with lining supplied by Pneumo Abex, to NAPA stores at a time when Mr. Burger was performing brake replacements, the evidence does not reasonably support the inference that Mr. Burger purchased the General Auto Parts brakes shoes. Mr. Burger admitted that he did not know who manufactured the brake shoes, which he purchased from the NAPA store, and General Auto Parts' answers to interrogatories in an unrelated case indicates NAPA stores are independent retail stores carrying other lines of automotive parts. Since

18. As is discussed *infra,* we conclude the Burgers have not presented a genuine issue of material fact as to whether Mr. Burger inhaled asbestos from a product, which was manufactured by Pneumo Abex. Therefore, we find it unnecessary to determine whether the attached interrogatories, which were given in an unrelated case, were appropriately relied upon by the Burgers in opposing the entry of summary judgment.

the Burgers did not provide evidence that Mr. Burger purchased from the NAPA store brake shoes, which were manufactured by General Auto Parts, we conclude the evidence simply does not present a jury with a genuine issue of material fact that Pneumo Abex manufactured the brake shoes, which caused injury to Mr. Burger. *See Bugosh v. Allen Refractories Company*, 932 A.2d 901 (Pa.Super.2007), *appeal granted, Bugosh v. I.U. North America, Inc.*, 596 Pa. 265, 942 A.2d 897 (2008) (holding that liability will not attach in a products liability case unless the plaintiff provides proof of product identification). Therefore, the trial court properly entered summary judgment in favor of Pneumo Abex.[19]

¶ 33 Regarding the entry of summary judgment in favor of Owens–Illinois, the Burgers allege they presented a genuine issue of material fact as to whether Mr. Burger inhaled asbestos fibers from an asbestos-containing product, which was manufactured by Owens–Illinois.

¶ 34 In his deposition, Mr. Burger testified that, starting in 1954, he began working at New York Ship in Camden, New Jersey. Deposition of Jon Burger, dated 2/28/06, at 26. Mr. Burger worked at New York Ship for one and a half years in the electrical department. *Id.* at 26. Specifically, he assisted in constructing three supertanker ships, although he could not recall the name of the ships. *Id.* at 26–27. Mr. Burger testified that, while working aboard the ships, he definitely handled asbestos, which came from the insulation used in the compartments and walls of the ships. *Id.* at 28. Specifically, he remembered eating his lunch and the asbestos dust was so thick that the workers could make snowballs out of it. *Id.* at 28. He also came into contact with asbestos, which was being used as a pipe covering. *Id.* at 29. The pipe covering arrived in boxes, and he recalled seeing the name "Johns–Mansfield" on the box. *Id.* at 29–31. With regard to identifying the asbestos materials with which he came into contact, Mr. Burger was shown a book, which contained pictures of various products, including Kaylo, which was a product manufactured by Owens–Illinois.[20] *Id.* at 146. Mr. Burger did not make any notation that he recognized Kaylo. *Id.* at 146–149.

¶ 35 It is clear that Mr. Burger's deposition testimony was insufficient to create a genuine issue of material fact as to whether Mr. Burger inhaled asbestos fibers from a product, which was manufactured by Owens–Illinois. That is, Mr. Burger presented no testimony establishing that a product manufactured by Owens–Illinois produced the asbestos dust, which Mr. Burger inhaled while working at New York Ship. However, this does not end our inquiry as the Burgers attached to their motion in opposition to the entry of summary judgment the affidavit and deposition of Willie Lowe and the deposition of George Berkemeier, which were given in other, unrelated cases. Assuming, *arguendo*, the affidavits and depositions could be considered by the trial court, we agree with the trial court that the affidavit and depositions did not create a genuine issue of material fact as to whether Mr.

---

19. In light of this conclusion, we find it unnecessary to proceed to a "frequency, regularity, and proximity" causation analysis under *Gregg*.

20. It is noteworthy that, during his deposition, with regard to the name "Owens–Illinois," Mr. Burger's only memory was using insulation manufactured by Owens–Illinois when he insulated his house. Jon Burger's Deposition dated 2/28/06 at 137. That was his only recollection with respect to Owens–Illinois. *Id.* at 137. The Burgers have presented no argument with regard to this exposure on appeal.

Burger inhaled asbestos fibers from a product, which was manufactured by Owens–Illinois.

¶ 36 The Burgers' argument, in its entirety, regarding the facts supported by Mr. Lowe and Mr. Berkemeier, is as follows:

> Willie Lowe, who worked at New York Ship from 1941–64, testified that when the insulation work at New York Ship was contracted out to Philadelphia Asbestos Corporation ("PACOR") in 1953, PACOR start[ed] using Owen's Kaylo insulation. George Berkemeier, who worked for PACOR from 1955–74, testified in other asbestos cases that PACOR supplied asbestos products and did insulation work at New York Ship during the years that Mr. Berkemeier worked there. Owens' Kaylo was around forty per cent of the calcium silicate insulation used at New York Ship. Owens' Kaylo pipe covering was calcium silicate asbestos-containing insulation product. PACOR was the only insulation contractor at New York Ship from 1953–67. Since there was at least a 40% chance that he actually handled Owens' Kaylo, this created a jury question.

Burgers' Appellate Brief at 33 (citations to record omitted).

¶ 37 In a light most favorable to the Burgers, the deposition testimony at issue reveals that, during the time period Mr. Burger worked at New York Ship, PACOR was the subcontractor for pipe covering work. However, by all accounts, PACOR provided asbestos-containing calcium silicate block and pipe insulation, which was manufactured by numerous companies, including Owens–Illinois' "Kaylo." However, neither Mr. Lowe's nor Mr. Berkemeier's deposition reveals that Owens–Illinois' Kaylo was used on one of the three ships, where Mr. Burger worked. The fact Mr. Berkemeier guessed that Kaylo accounted for approximately forty percent of the calcium silicate block insulation used at the entire shipyard does not create a genuine issue of material fact that the product was used on a ship where Mr. Burger could have inhaled the fibers produced therefrom. *See Gregg, supra; Tarzia, supra* (indicating that evidence must create a genuine issue of material fact that the defendant manufactured the particular product, which caused harm to the plaintiff in consideration of the "frequency, regularity, and proximity" factors discussed in *Gregg*); *Gutteridge, supra* (indicating the plaintiff must establish more than mere presence of asbestos in the workplace). Therefore, we conclude the trial court did not err in granting summary judgment in favor of Owens–Illinois.[21]

21. The Burgers contend that, since Mr. Burger's exposure at the shipyard occurred in New Jersey and they are residents of New Jersey, this Court should apply New Jersey law in determining whether the Burgers presented sufficient evidence to overcome the entry of summary judgment as to Owens–Illinois. The Burgers specifically argue that this Court's holding in *Taylor v. The Celotex Corp.*, 393 Pa.Super. 566, 574 A.2d 1084 (1990), requires the conclusion that summary judgment was improperly granted against the Burgers.

In *Taylor*, Mr. Taylor worked at New York Shipyard in Camden, New Jersey, and he developed an asbestos-related disease. The issues of liability and damages were tried pursuant to the substantive law of New Jersey, which the parties did not challenge. Following a jury verdict in favor of the Taylors, the defendants/appellants contended the evidence was insufficient to prove Mr. Taylor's injuries were caused by the specific products manufactured by the defendants/appellants. This Court noted that New Jersey law requires that a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the particular product which was a proximate cause of the plaintiff's injury. *Taylor, supra.* This Court then reasoned that, although Mr. Taylor did

¶ 38 For all of the foregoing reasons, we affirm the entry of summary judgment in favor of Crown Cork, DAP, Pneumo Abex, and Owens–Illinois.

¶ 39 Affirmed. Appellants' Motion to Supplement The Brief is Granted.

¶ 40 KLEIN, J. files a Concurring and Dissenting Opinion in which MUSMANNO, PANELLA and DONOHUE, JJ. join.

### CONCURRING AND DISSENTING OPINION BY KLEIN, J.:

¶ 1 I begin by noting my agreement with the majority on the issues of product identification. I agree that there is insufficient evidence to establish liability on the part of DAP, Owens and Pneumo Abex. However, just as I dissented in *Johnson v. American Standard*, 966 A.2d 573, 2009 WL 281177 (Pa.Super.2009)(*en banc*). I must dissent

here. I believe that the Burgers have standing to challenge the constitutionality of the Crown Cork Statute, 15 Pa.C.S. § 1929.1. I also believe that the Crown Cork Statute both violates the Commerce Clause of the United States Constitution [1] and its application represents a denial of equal protection.[2] Thus, I would hold the law unenforceable, and so I must dissent.

### Standing

¶ 2 Here, the majority relied on the recently decided *Johnson v. American Standard* to find that the Burgers have no standing to challenge the constitutionality of the law. I disagreed with that determination in *Johnson* and continue to disagree here.

The core concept in any standing analysis is that a person who is not adversely affected in any way by the matter he

not identify any of the products manufactured by the defendants/appellants as ones with which he came into contact, he testified to working closely with three men, whom he identified by name. These three co-workers then testified to the ships on which they had worked and described the names of the products, which were used on the ships where Mr. Taylor worked. In the case *sub judice*, there was no such testimony, thereby rendering *Taylor* distinguishable. Mr. Burger could not name the ships where he worked and neither Mr. Lowe nor Mr. Berkemeier presented any testimony regarding whether Owens–Illinois' product was used on a ship, where Mr. Burger worked.

Moreover, in examining New Jersey appellate cases, we note that the New Jersey courts specifically require that "[i]n an asbestos case, plaintiff must present *prima facie* evidence of an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity in order to hold a defendant strictly liable." *Provini v. Asbestospray Corp.*, 360 N.J.Super. 234, 822 A.2d 627, 629–30 (quotation and quotation marks omitted) (N.J.Super.2003). That is, in order to avoid summary judgment, a plaintiff in New Jersey must produce evidence from which a jury could conclude, after assessing the fre-

quency and intensity of a plaintiff's contact with a particular manufacturer's asbestos, that the product caused the plaintiff's harm. *Provini, supra* (indicating the court would not assume that a plaintiff was exposed to a product because the product was used by the plaintiff's employer during the brief time he was employed). In the case *sub judice*, as discussed *supra*, while the Burgers presented evidence that Owens–Illinois' Kaylo product was used at the shipyard where Mr. Burger worked for one and a half years, there was no evidence presented that the product was used on a ship, let alone the vicinity, where Mr. Burger worked. *See Dafler v. Raymark Industries, Inc.*, 259 N.J.Super. 17, 611 A.2d 136 (App.Div.1992) (holding evidence was sufficient to raise jury question as to exposure where the plaintiff remembered the names of the ships on which he worked and a coworker, who worked on the same ships during the same time period, remembered the name of the specific asbestos-containing products used on the ship in the area where the plaintiff worked).

1. U.S. Const., Art. I, § 8, cl. 3.

2. U.S. Const., Amend. 14; Pa. Const., Art. 1, §§ 11, 26.

seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge.

*Soc'y Hill Civic Ass'n v. Pa. Gaming Control Bd.,* 593 Pa. 1, 928 A.2d 175, 184 (2007).[3]

¶ 3 I believe there are two aspects to consider when determining whether a plaintiff has standing to complain of a constitutional violation. First, was a right violated? Second, was the person adversely affected by the violation?

¶ 4 Here, I start with the premise that the statute does violate the Commerce Clause because it gives an advantage to a Pennsylvania corporation (Crown Cork and any hypothetical Pennsylvania corporation that might have acquired asbestos liability through successor liability) over other similarly situated foreign corporations.

¶ 5 The majority in *Johnson* recognized that a consumer or another who is not directly affected by the regulation may still assert a challenge if that person falls within the zone of interest. *Oxford Assocs. v. Waste Sys. Auth.* 271 F.3d 140 (3d Cir.2001). Generally, the interest must be substantial, *Commonwealth v. Rose,* 960 A.2d 149 (Pa.Super.2008), and the controversy real and concrete. *City of Phila. v. Commonwealth,* 575 Pa. 542, 838 A.2d 566, 569 (2003).

¶ 6 In *Johnson,* the majority found that there was no substantial interest in that there were still joint tortfeasors from whom damages might be collected. I disagreed because there was the clear possibility that Crown Cork/Mundet would be the only defendant found liable. If that proved to be the case, then Johnson would be unable to recover damages to which he is constitutionally entitled.

¶ 7 Here, that hypothetical situation is the reality, which, I believe, makes the argument even stronger. DAP, Owens–Illinois and Pneumo Abex, the last remaining co-defendants with Crown Cork, are absolved of liability. Crown Cork is the *only* remaining defendant against which Burger can collect his damages.

¶ 8 The Pennsylvania Constitution states:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

Pa. Const., Art. 1, § 11.

¶ 9 Yet application of the Crown Cork Statute would deny the Burgers their full remedy. I would have a difficult time finding a more substantial interest in a law.

¶ 10 Based on the above, I must disagree with the majority. I believe the Burgers have standing to raise the constitutional claims.

¶ 11 I believe that the Crown Cork Statute violates both the principles of equal protection as well as the Commerce Clause. I have stated those reasons in my dissent in *Johnson.* Nonetheless, because this is an important issue, I reiterate my reasoning.

**Equal protection**

¶ 12 I agree with the general proposition that the Pennsylvania legislature has the right to enact statutes which control the fate of Pennsylvania corporations. What the Pennsylvania legislature cannot do is enact a statute that improperly grants favor to a Pennsylvania corporation while putting foreign corporations at a disadvan-

---

**3.** The majority opinion in *Johnson* cited this passage at page 577.

tage such that the due process rights of a plaintiff are adversely affected.

¶ 13 In *Ieropoli v. AC&S. Corp.*, 577 Pa. 138, 842 A.2d 919 (2004), our Supreme Court held the statute now at issue unconstitutional because it denied the due process rights of individuals whose cause of action had vested prior to the enactment of the law. This is a classic violation of due process. Our Supreme Court left open, however, the question of the constitutionality of the statute as applied to those causes of action that accrued *after* December 17, 2001 (such as the instant case). That question is now before us.

¶ 14 The essence of equal protection is simply that persons of a class cannot be denied the protection of the laws that other persons of the same class enjoy. *See* U.S. Const., Amend. 14; Pa. Const., Art. 1, § 26.

¶ 15 Here, defendants in asbestos litigation are the main class of persons involved. However, § 1929.1 carves out a sub-class of defendants currently consisting of a single Pennsylvania corporation which is subject to the payment of damages through the legal concept of successor liability. One might also find the main class consists of corporations which are subject to the payment of damages through successor liability and the sub-class to be corporations subject to the payment of asbestos damages through successor liability.

¶ 16 In either event, there is no clear showing why a foreign corporation that is subject to the payment of damages for asbestos-related harm through successor

liability should be denied a similar protection. In this manner, I believe that *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968), is instructive. In *WHYY*, the United States Supreme Court found it to be a violation of equal protection for New Jersey to deny a foreign corporation the benefit of certain tax exemptions that were allowed to New Jersey registered nonprofit corporations. The Supreme Court stated:

> This Court has consistently held that while a State may impose conditions on the entry of foreign corporations to do business in the State, once it has permitted them to enter, 'the adopted corporations are entitled to equal protection with the state's own corporate progency, at least to the extent that their property is entitled to an equally favorable ad valorum tax basis.'

*Id.* at 119, 89 S.Ct. 286 (citations omitted).

¶ 17 While the matter before us is not a tax issue, I can see no reason why the logic of the *WHYY* decision would not be applicable here. Once the Commonwealth of Pennsylvania allowed corporations that had asbestos liability into the Commonwealth to do business, it must treat those adoptive corporations the same as it treats Pennsylvania corporations. Or, once the Commonwealth allows any corporation which has accepted liability through purchase or merger of another corporation into Pennsylvania, it must offer similar protection to that foreign corporation.[4] By

---

4. I am aware that the *WHYY* decision has been distinguished by *Feniello v. University of Pennsylvania Hospital*, 558 F.Supp. 1365 (D.C.N.J.1983), which stated, regarding *WHYY:* "There is no indication in the opinion that the same ruling would apply to the state's power to grant a corporation limited immunity from tort liability." I believe *Feniello* is inapplicable for a number of reasons. First, this is merely *dicta* from the federal district court and is not binding upon us. Second, and most importantly, in *Feniello*, the hospital did no business in New Jersey yet sought the protection of New Jersey charitable laws, the denial of which was not unconstitutional. Here, all other defendants are doing business in Pennsylvania, thus would be subject to Pennsylvania law.

allowing this benefit to a Pennsylvania corporation, foreign corporations would have to pay more than their proportional share of damages and would be unable to seek contribution from a protected Pennsylvania corporation.

¶ 18 While it appears that the statute in question treats similar corporations dissimilarly, in violation of equal protection of laws, it is more important under the facts of this case, how that dissimilar treatment affects the rights of plaintiffs.[5]

¶ 19 Here, the Burgers are forbidden from seeking redress from the sole source liability simply because that source, a Pennsylvania corporation, acquired the liability through the purchase of another corporation and by dint of the fact that their claims were unknown until after December 17, 1993. Thus, if Jon Burger had been exposed to any other asbestos manufacturer or supplier other than Mundet/Crown Cork, he would be entitled to seek full redress from all those responsible. Similarly, if Burger had known of his illness prior to December 17, 1993 he would also be entitled to seek redress from Mundet/Crown Cork.

¶ 20 It is admitted that Burger was exposed to asbestos from a Mundet product, and if we suppose that the exposure can be linked to his fatal disease, then the simple fact that the disease may have taken a bit longer to manifest itself in Burger than in another now prevents him from seeking compensation from the sole admitted responsible party.[6] Thus, Burger has been denied equal protection of the law due to the operation of 15 Pa.C.S. § 1929.1. Not

only has equal protection been violated as regarding the Fourteenth Amendment and Article 1, section 26 of the Pennsylvania Constitution, but, as noted earlier, the application of section 1929.1 also offends equal protection under Article 1, section 11, which provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

Pa. Const., Art. 1, § 11.

¶ 21 Burger is entitled to seek the full measure of remedy against those who may have caused him harm. Section 1929.1 prevents that from happening by arbitrarily disallowing Burger from seeking a constitutionally guaranteed remedy on the basis of the date he knew of his injury and because the legislature has opted to treat a single Pennsylvania corporation differently from any and every other foreign corporation.

### Commerce Clause

¶ 22 I also believe that the Crown Cork and Seal Act violates the Commerce Clause of the United States Constitution, Art. 1, cl. 3. As the majority notes, "the dormant Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Office of Disciplinary Counsel v. Marcone*, 579 Pa. 1, 855 A.2d 654, 666 (2004). It is hard to dispute that the Crown Cork and Seal Act gives an

---

**5.** The dissimilar treatment of corporations may not be properly before us because no other defendant corporation has complained of unequal protection. However, the analysis is still important because of the way the dissimilar treatment of corporations' impacts upon the treatment of plaintiffs. Thus, we do not believe this analysis is uncalled for *dicta*.

**6.** Other aspects of this case have settled. However, we have no knowledge of the details of the settlements with any other defendants. We do not know what damages, if any, have been collected from any other defendant.

advantage to those Pennsylvania Corporations that acquired asbestos companies while *not* giving such protection to out-of-state corporations who made similar acquisitions.

¶ 23 In *Granholm v. Heald*, 544 U.S. 460, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005), the United States Supreme Court used the dormant commerce clause to strike down provisions in Michigan and New York that allowed in-state but not out-of-state wineries to make direct sales to consumers. In that case, the United States Supreme Court, citing *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13, (1994), said:

> This Court has long held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Laws such as those at issue contradict the principles underlying this rule by depriving citizens of their right to have access to other States' markets on equal terms.

544 U.S. at 461, 125 S.Ct. 1885.

¶ 24 In *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), the United States Supreme Court struck down a North Carolina "intangibles tax" that taxed the value of corporate stock owned by state residents in inverse proportion to the corporation's exposure to the state's income tax, holding it discriminated against interstate commerce.

¶ 25 Following *Fulton*, the Pennsylvania Supreme Court in *Annenberg v. Commonwealth I*, 562 Pa. 570, 757 A.2d 333, and *Annenberg v. Commonwealth II*, 562 Pa.

581, 757 A.2d 338 (2000), struck down a provision imposing personal property tax on the value of stock held by out-of-state corporations but not in-state corporations. Here it was the *taxpayer* that objected to the tax, not one of the corporations that might have been harmed by the tax that impaired commerce.

¶ 26 It seems abundantly clear to me that 15 Pa.C.S.A. § 1929.1 provides the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" that is constitutionally forbidden.

¶ 27 For these reasons, I would reverse the lower court determination and allow these plaintiffs to pursue their claims. Accordingly, I dissent.